**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHINA UNICOM (AMERICAS) OPERATIONS LIMITED,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

No. 22-70029

OPINION

On Petition for Review of an Order of the Federal Communications Commission

Argued and Submitted February 15, 2023 Honolulu, Hawaii

Filed December 24, 2024

Before:  Carlos T. Bea, Daniel P. Collins, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge Collins; Dissent by Judge Bea

# SUMMARY[*]

## Communications Act of 1934

The panel denied a petition for review brought by China Unicorn (Americas) Operations Limited ("CUA") challenging the Federal Communications Commission's ("FCC") revocation of certificates authorizing CUA to provide domestic and international telecommunications services.

In revoking the certificates, which were issued pursuant to § 214 of the Communications Act of 1934, the FCC found that CUA had failed to dispel the national security concerns arising from its ultimate Chinese government ownership and that CUA had demonstrated a lack of candor and trustworthiness in its representations to the FCC.

Applying *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the panel reviewed de novo whether the FCC correctly interpreted its authority under the Communications Act. The panel held that the statute's grant of authority to "issue" certificates to telecommunications carriers must be understood as carrying with it an implied incidental authority to revoke such certificates. Also, there was no indication in the statutory text or structure that Congress denied the FCC any relevant authority to revoke a carrier's § 214 certificate.

CUA contended that the revocation order should be set aside under the Administrative Procedure Act. The panel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that the FCC's decision to revoke CUA's certificates based on national security concerns was reasonable and supported by substantial evidence, and was not arbitrary and capricious. In addition, the FCC's alternative ground for revoking CUA's certificates—that it had exhibited a lack of candor and trustworthiness with the FCC—was also amply supported and was not arbitrary and capricious. The panel also rejected CUA's contention that the FCC failed to follow the requisite procedures prior to revoking CUA's § 214 certificates.

Judge Bea dissented. He disagreed with the majority's view that the FCC's statutory power to grant § 214 certificates under the Communications Act of 1934 necessarily implied the power to revoke such certificates solely upon its own volition. He would grant CUA's petition, vacate the FCC's order, and remand with instruction for the FCC to reinstate CUA's § 214 certificates.

## COUNSEL

Keith Bradley (argued), Squire Patton Boggs LLP, Denver, Colorado; Jeffrey M. Walker, Squire Patton Boggs LLP, Columbus, Ohio; Robert E. Stup Jr. and Paul C. Besozzi, Squire Patton Boggs LLP, Washington, D.C.; for Petitioner.

Matthew J. Dunne (argued), Counsel; Jacob M. Lewis, Deputy General Counsel; P. Michele Ellison, General Counsel; Federal Communications Commission, Public Safety and Homeland Security Bureau, Washington, D.C.; Casen B. Ross and Sharon Swingle, Attorneys, Appellate Staff; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondents.

**OPINION**

COLLINS, Circuit Judge:

China Unicom (Americas) Operations Limited ("CUA"), a California corporation ultimately owned by the Chinese government, was authorized to provide domestic and international telecommunications services pursuant to certificates granted to it many years ago by the Federal Communications Commission ("the Commission" or "FCC") under § 214 of the Communications Act of 1934. In May 2019, however, the FCC denied an application for § 214 authorization submitted by a different Chinese government-owned carrier, China Mobile. The latter denial relied significantly on the views submitted by a number of Executive Branch agencies, which concluded that Chinese government control of a telecommunications carrier presented significant national security concerns. Thereafter, in April 2020, the FCC issued an order directing CUA to show cause why the FCC should not revoke its § 214 certificates in light of the national security concerns articulated during the proceedings involving China Mobile. After receiving CUA's response, the FCC solicited input on the matter from a committee composed of the relevant Executive Branch agencies. That committee identified several concerns regarding CUA's continued ownership of a U.S. telecommunications carrier, and CUA thereafter submitted a further response to the committee's letter. Finding CUA's responses inadequate to resolve the Executive Branch committee's concerns, the FCC instituted proceedings to revoke CUA's § 214 certificates. Ultimately, after further input from CUA, the FCC issued an order revoking the certificates on the grounds that CUA's retention

of them presented an unreasonable national security risk and, separately, that CUA had exhibited a lack of candor and trustworthiness over the course of the proceedings.

CUA filed a petition for review of the FCC's revocation order in this court, arguing that the Commission lacked statutory authority to revoke CUA's certificates, that its decision to do so was arbitrary and capricious, and that it revoked the certificates without following proper procedures. We reject CUA's arguments on each of these points and, accordingly, deny its petition.

# I

To set the factual history in its proper context, we begin with an overview of the relevant authorities governing the FCC's power to regulate telecommunications services. We then summarize the relevant factual and procedural history concerning the issuance and revocation of CUA's certificates.

## A

The Communications Act of 1934 established the FCC as an agency and granted it centralized authority over "interstate and foreign commerce in wire and radio communication." 47 U.S.C. § 151. The Act states that Congress conferred these powers on the FCC for the purpose of "mak[ing] available," on a non-discriminatory basis, "a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges"; "for the purpose of the national defense"; and "for the purpose of promoting safety of life and property through the use of wire and radio communications." *Id*.

As relevant here, the Communications Act regulates the activities of any "carrier," which is generally defined to be

"any person," other than a radio broadcaster, who is "engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy." 47 U.S.C. § 153(11). Section 214(a) of the Act requires any "carrier" to obtain a "certificate" from the FCC before it may construct, operate, or acquire any "lines" used for telecommunications services. Specifically, the Act provides:

> No carrier shall undertake the construction of a new line or of an extension of any line, *or shall acquire or operate any line*, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line . . . .

*Id*. § 214(a) (emphasis added).[1]   For purposes of this provision, a "line" is generally defined to mean "any channel

---

[1] There is arguably a literal mismatch between the sweep of § 214(a)'s general prohibition and § 214(a)'s description of the permission granted by the certificate.   The prohibitory clause expressly covers both "construction of a *new* line or of an *extension* of any line" as well as "acquir[ing] or operat[ing] *any* line," thereby prohibiting, absent a certificate, any acquisition or operation of telecommunications lines by a carrier (even without undertaking construction of a new or extended line).   47 U.S.C. § 214(a).   The clause describing the object of the certificate, however, refers only to the "operation[] of such additional or

of communication established by the use of appropriate equipment." *Id*. Section 214(a) further states that "[n]o carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby." *Id*. The Act, however, exempts from these certificate requirements "any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided." *Id*. Thus, as a general matter, authorization from the FCC is required for any carrier to build, acquire, or operate any telecommunications lines and for any carrier to discontinue, impair, or reduce services. Notably, the Act further authorizes the FCC to "attach to the issuance" of any such certificate "such terms and conditions as in its judgment the public convenience and necessity may require." *Id*. § 214(c).

In furtherance of the Act's purpose of supporting "the national defense," 47 U.S.C. § 151, the FCC must provide notice and a copy of all applications for telecommunications certificates to the Secretary of Defense and, if such applications involve the provision of international services,

---

extended line," rather than "any line" generally. *Id*. But it would be absurd to read the statute as failing to allow the issuance of certificates that authorize activities that are coextensive with the full range of activities covered by the prohibitory clause. Neither party advocates such a mismatched reading here. On the contrary, CUA expressly agrees that § 214 controls *any* entry into the telecommunications market.

to the Secretary of State as well, *id*. § 214(b).[2]   The Departments of Defense and State have the right "to be heard" by the FCC on any such application. *See id*.  Finally, the FCC has ancillary authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with [the Act], as may be necessary in the execution of its functions." *Id*. § 154(i).  This provision is, in effect, a "necessary and proper" clause that enables the FCC to carry out its statutory authorities; it "is not a stand-alone basis of authority." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002) (citation omitted).

As we will discuss further below, § 214 does not explicitly address the subject of revoking certificates after they have been granted.  However, the FCC has construed its authority to grant, refuse, and condition § 214 certificates as including the power to revoke a common carrier's certificate either when the carrier has violated the Commission's rules or when the Commission concludes that, for other reasons, the public interest so requires.  47 U.S.C. §§ 151, 214(a), (c); *see*, *e.g.*, *Pacific Networks Corp. & ComNet (USA) LLC*, 36 FCC Rcd. 6368, 6370 ¶ 3 (2021).

In the late 1990s, as the telecommunications industry underwent substantial changes, the FCC decided to significantly alter the process by which it grants § 214 certificates.  With respect to applications seeking certificates relating to domestic telecommunications lines and services, the FCC replaced its prior practice of evaluating each

---

[2] Section 214(b) also provides that the FCC must likewise supply notice and a copy to the Governor of any affected State, but that notification requirement would appear to be tied primarily to the declared purposes of the Act other than the protection of the national defense.

application individually with a general grant of blanket authority for any common carrier to operate or transmit over domestic lines. *See Implementation of Section 402(b)(2)(A) of the Telecomms. Act of 1996*, 14 FCC Rcd. 11364, 11365 ¶ 2 (1999) (hereinafter "*Domestic Blanket Order*"); *see also* 47 C.F.R. § 63.01(a). The agency stated that it had considered adopting a policy of "forbearance"—*i.e.*, abstention from enforcement of § 214's certification requirement altogether—but rejected that option as "not in the public interest" because the statutory certification requirement remained an important "enforcement tool" that was necessary to prevent "abusive practices" and to protect consumers.[3] *Domestic Blanket Order*, 14 FCC Rcd. at 11373 ¶ 14. The FCC instead opted to grant, on a blanket basis, certification for domestic construction and operation of telecommunications lines. *Id*. at 11374 ¶ 16. The FCC based this blanket granting of certification on its general determination that "the present and future public convenience and necessity require the construction and operation of all domestic new lines." *Id*. However, in adopting this approach, the FCC specifically stated that it reserved the authority "to revoke a carrier's section 214 authority when warranted in the relatively rare instances in which carriers may abuse their market power or their common carrier obligations."[4] *Id*.

---

[3] Under § 10 of the Communications Act, as added in 1996, the FCC is specifically authorized to "forbear from applying any regulation or any provision" of the Act if specified conditions are met, including that such forbearance "is consistent with the public interest." 47 U.S.C. § 160(a).

[4] Although the general authority conferred under the *Domestic Blanket Order* does not take the form of an individual "certificate" in the

A few years prior to this modification of the domestic authorization process, the FCC had also simplified its process for reviewing applications from foreign carriers. In 1997, the FCC adopted a "presumption in favor of foreign participation" in telecommunications services and "open entry policies" for foreign-owned companies from countries that are members of the World Trade Organization. *Rules & Policies on Foreign Participation in the U.S. Telecomms. Mkt.*, 12 FCC Rcd. 23891, 23897 ¶ 13 (1997) (hereinafter "*Foreign Participation Order*"). Given its "statutory obligation to ensure that [a] grant of Section 214 authority is consistent with the public convenience and necessity," the FCC stated that it would continue to "consider[] the overall impact of the grant of authority on the public interest" when assessing "all applications, from both foreign and domestic applicants," as it had since the enactment of the Communications Act. *Id*. at 23910 ¶ 44.

The public interest factors that the FCC assesses relative to foreign carriers include "national security, law enforcement, foreign policy and trade policy concerns brought to [the Commission's] attention by the [relevant] Executive Branch [agencies]." *Foreign Participation Order*, 12 FCC Rcd. at 23917 ¶ 59. Recognizing that "foreign participation in the U.S. telecommunications market may implicate significant national security or law enforcement issues uniquely within the expertise of the Executive Branch," *id*. at 23919 ¶ 62, the FCC has long "worked closely with Executive Branch agencies to ensure

---

traditional sense, *see* 47 C.F.R. § 63.01, we will continue to refer to the resulting authorization of service, in the context of a specific company such as CUA, as that company's "certificate," because that is the statutory term for the requisite authorization. *See* 47 U.S.C. § 214(a).

that [its] actions and policies affecting international telecommunications do not impede or thwart [those] of the Executive Branch," *id*. at 23917 ¶ 59.   The *Foreign Participation Order* affirmed that the FCC would continue this longstanding practice. *See id*. at 23918 ¶ 61.   While national security concerns related to foreign carriers are "quite rare," the FCC stated that any input regarding them "would . . . be important to [the Commission's] public interest analysis of a particular application" and affirmed that it would "continue to accord deference to the expertise of Executive Branch agencies in identifying and interpreting issues of concern related to national security, law enforcement, and foreign policy." *Id*. at 23919 ¶ 63.   In this manner, the FCC has continued to evaluate whether a carrier's provision of telecommunications services in the United States implicates national-security-related risks due to the carrier's foreign ownership. *See id*. at 23918 ¶ 61.   In the *Foreign Participation Order*, the FCC explicitly "emphasize[d] that [it] ha[s] authority to enforce [its] safeguards through fines, conditional grants of authority and the revocation of authorizations." *Id*. at 23900 ¶ 19; *see also id*. at 24022 ¶ 295.

## B

CUA is incorporated in California and headquartered in Virginia.   It is wholly owned by China Unicom Global Limited ("CUG"), a Hong Kong company, which is in turn wholly owned by China Unicom (Hong Kong) Limited ("CUHK"), a company publicly traded on the Hong Kong Stock Exchange.   CUHK's ultimate parent is China United Network Communications Group Company Limited

("CU"), which is wholly owned by the Chinese government.[5]

In 2002, the FCC issued international § 214 certificates to CUA's predecessor entities, China Netcom USA Operations Limited and China Unicom USA LLC. These certificates were subject to the general conditions that the FCC imposes on all international certificates. CUA, through its predecessor entities, also began domestic telecommunications operations in 2002 under the general authorization that the FCC has provided to common carriers since the 1999 *Domestic Blanket Order*. *See* 47 C.F.R. § 63.01. As noted earlier, we will continue to use the statutory term "certificate" to refer to the authorization provided to CUA under the *Domestic Blanket Order*, even though no individualized formal certificate is issued under that order. *See supra* note 4.

## C

### 1

In recent years, the FCC, in consultation with other Executive Branch agencies, has undertaken a reassessment of the national security and law enforcement risks posed by Chinese government-owned telecommunications companies operating in the United States. For example, in May 2019, the FCC denied an application for § 214 authorization submitted by China Mobile, a different carrier that is also owned by the Chinese government. *See China Mobile Int'l (USA) Inc.*, 34 FCC Rcd. 3361 (2019) (hereinafter "*China Mobile Order*").

---

[5] A complete accounting of CUA's ownership chain is outlined below. *See infra* Section I(C)(1).

In April 2020, President Trump signed Executive Order No. 13913, which formally established an Executive Branch committee, comprised of members from the Departments of Defense, State, Justice, and Commerce, as well as other relevant agencies, "to assist the FCC in its public interest review of national security and law enforcement concerns that may be raised by foreign participation in the United States telecommunications services sector." *See* Exec. Order No. 13,913, 85 Fed. Reg. 19643, 19643 ¶ 3 (Apr. 8, 2020). Specifically, the Order authorizes the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("the Committee") to make recommendations to the FCC about whether to grant or deny § 214 applications and whether to revoke existing authorizations. *See id*. at 19645 ¶ 6, 19646 ¶ 9(b).

Shortly after the formal establishment of the Committee, the FCC's International, Wireline Competition, and Enforcement Bureaus jointly ordered CUA on April 24, 2020 to show cause why the FCC should not initiate proceedings to revoke its § 214 certificates. *China Unicom (Ams.) Operations Ltd.*, 35 FCC Rcd. 3721 (2020) (hereinafter "*Order to Show Cause*"). The *Order to Show Cause* explained that the FCC's findings in the *China Mobile* matter concerning the susceptibility of Chinese state-owned enterprises, including subsidiaries, to Chinese government influence, control, and exploitation raised questions about CUA's "ongoing qualifications to hold domestic and international section 214 authorizations." *Id*. at 3724 ¶ 7. The order gave CUA the opportunity to file a written response providing evidence as to its ongoing qualifications to hold § 214 certificates and to explain why the FCC should not initiate proceedings to revoke them. *Id*. at 3724–25 ¶ 8. It also directed CUA to respond to specific questions about

its ownership, operations, and corporate governance. *Id*. at 3725 ¶ 9. Specifically, the *Order to Show Cause* requested that CUA include the following information in its response: (1) "a detailed description of the current ownership and control (direct and indirect) of the company and the place of organization of each entity in the ownership structure"; (2) an "identification of [CUA's] officers, directors, and senior management officials, their employment history (including prior employment with the Chinese government), and their affiliations with the Chinese Communist Party [('CCP')] and the Chinese government"; (3) "an identification of all officers, directors, and other senior management of entities that hold ten percent or greater ownership interest in [CUA], their employment history (including prior employment with the Chinese government), and their affiliations with the [CCP] and the Chinese government"; and (4) "a description of the extent to which [CUA] is or is not otherwise subject to the exploitation, influence and control of the Chinese government." *Id*. at 3725–26 ¶ 9.

The FCC had also discovered that when an internal reorganization transferred control of CUA from CUHK to one of CUHK's wholly owned subsidiaries, CUA failed to file the required *pro forma* notification of this transfer in compliance with FCC rules. *See Order to Show Cause*, 35 FCC Rcd. at 3726 ¶ 9 & n.31. The FCC requested in the *Order to Show Cause* that CUA confirm whether there had been an internal transfer of control and whether the FCC had been properly notified. *See id*.

In its response to the *Order to Show Cause*, CUA argued that revocation of § 214 certificates is a limited "enforcement remedy" for serious misconduct, which it claimed had not been alleged against CUA, and that the FCC

could not initiate revocation proceedings on the basis of unsubstantiated concerns about national security risks posed by CUA's ownership structure.  CUA stated that, if such proceedings were instituted, "the Commission was required to conduct a full hearing under its formal adjudication rules before taking any action."  CUA also provided its responses to the FCC's specific questions regarding its ownership, corporate governance, and susceptibility to Chinese government influence.

With regard to CUA's ownership structure, the FCC's *Order to Show Cause* had specifically asked about direct and indirect "control" of CUA.  In response, CUA provided an exhibit that outlined its ownership structure and purported to explain the ownership percentages held by each entity as follows:

- CUA is 100% owned by CUG, a registered Hong Kong company, which in turn is 100% owned by CUHK;

- CUHK, a registered Hong Kong company listed on the New York and Hong Kong Stock Exchanges, is 26.4% owned by China Unicom Group Corporation (BVI) Limited ("CUG BVI"), 53.5% owned by China Unicom (BVI) Limited ("CU BVI"), and 20.1% owned by public shareholders;

- CUG BVI, a registered British Virgin Islands company, is 100% owned by CU;

- CU BVI, also a registered British Virgin Islands company, is 17.9% owned by CU and 82.1% owned by China United

Network Communications Limited ("CU A-Share");[6]

- CU A-Share, a registered Beijing company listed on the Shanghai Stock Exchange is 36.7% owned by CU, 35.2% owned by "a group of strategic investors," 25.5% owned by public shareholders, and 2.6% owned by employees; and

- CU, a registered Beijing company, is 98.45% owned by the State-owned Asset Supervision and Administration Commission of the State Council, a Chinese government entity.

This exhibit, along with CUA's statements, represented that CU, "through its ownership in CU A-Share, CU BVI, and CUG BVI[,] ha[d] an *effective interest of approximately 52.1%* of [CUHK's] equity" (emphasis added).[7]  Again, CUHK wholly owns CUA through CUG.

Regarding corporate governance, CUA explained that, as a California corporation, it is managed and controlled by its board of directors.  CUA's bylaws provide that the number of directors is fixed by CUG, which "appoints the board members and management team, and approves the annual business plan and budget of CUA."  CUA further explained that CUHK, which wholly owns CUG, is responsible for establishing and maintaining both CUG and

---

[6] We adopt the abbreviation both parties use for this entity.

[7] CUHK's 2020 Form 20-F filing with the SEC, by contrast, stated that CU indirectly *owned* 79.9% of CUHK.  *See infra* at 46.

CUA's risk management and internal control systems, which include financial, operational, and compliance controls.

As to the identities and government affiliations of the officers and directors of CUA and its parent entities, CUA's response listed only the officers, directors, and senior management for CUA and CUG, rather than for all entities with more than a 10% indirect interest in CUA, as the FCC had requested. CUA noted in its response that "certain directors of CUG are [CCP] members," but otherwise did not identify the specific individuals, nor indicate whether other parent entity officers and directors had government affiliations.

With respect to the FCC's inquiry about CUA's apparent failure to file a required notice of transfer of control, CUA confirmed that it had indeed failed to notify the FCC of the internal reorganization. It did not, however, retroactively file the requisite notification at the same time it filed its response.

Finally, regarding the FCC's inquiry into the extent to which CUA may be subject to exploitation, influence, and control by the Chinese government, CUA argued that the FCC had unfairly alleged "unspecified national security concerns about 'exploitation' and 'influence'" and did not set out "specific facts or parameters" regarding Chinese government "control" to which CUA could respond. CUA represented that "none of the company's senior management or board members was appointed by the Chinese government," that CUA is required to operate in compliance with U.S. laws and regulations, and that CUA "has never received, and would not accept, any instructions on regarding how to run its operations from the Chinese government."

After CUA filed its response, the FCC International Bureau requested that the Committee give its own response to CUA's arguments against revocation. The Committee provided that response in the form of a letter submitted to the FCC on November 16, 2020.[8] The Committee's letter did not make a formal recommendation regarding revocation of CUA's § 214 certificates, in part because of the "limited time" the Committee had to offer a response. However, the Committee's letter explained that "changes in [Chinese] law have resulted in [Chinese government]-owned and -controlled companies presenting significant national security and law enforcement risks that are difficult to mitigate." As a result, it said, "[t]he national security environment has changed significantly since 2002," when CUA's § 214 certificates were initially granted. The Committee's letter described assessments by several of its agencies regarding the national security threats posed by China, including economic espionage, threats to critical infrastructure, and cyberattacks. With regard to telecommunications specifically, the Committee's letter highlighted federal legislation enacted in 2017 that prohibits the spending of loans or grants on telecommunications equipment from entities connected to the Chinese government. *See* National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1656, 131 Stat. 1283, 1762 (2017).

The Committee's letter then addressed evidence that CUA's parent entities are led by board directors and

---

[8] Throughout its letter, the Committee repeatedly referenced a June 9, 2020 report regarding threats posed by Chinese government-owned carriers, which was prepared by the staff of the Permanent Subcommittee on Investigations ("PSI") of the Senate Committee on Homeland Security and Governmental Affairs ("the PSI Report").

executive officers who are members of the CCP, arguing that this made CUA "vulnerable to direct exploitation" by the Chinese government, including through CCP directives. It asserted that CUA's ultimate parent company, CU, has already demonstrated compliance with CCP and Chinese government requests, including, notably, by providing material assistance to the CCP's mass surveillance initiatives against the Uyghur population in Xinjiang. The letter also discussed recent Chinese laws, including the 2017 Cybersecurity Law and the 2017 National Intelligence Law, which "impose affirmative legal responsibilities on Chinese and foreign citizens, companies, and organizations operating in China to provide access, cooperation, and support for Beijing's intelligence gathering activities." The Committee noted that CUA's corporate parents, CU and CUHK, "have acknowledged being subject to" these laws.

The Committee letter described CUA as providing global "telecommunications and [i]nternet services," as well as "data center and cloud-based services." The Committee expressed concerns that CUA's capabilities, physical U.S. infrastructure, and U.S. operations "provide opportunities for [Chinese] state actors to engage in economic espionage, to collect, disrupt, or misroute U.S. communications, and to access U.S. customer data." It claimed that such risks are heightened by CUG's management and storage of CUA's American customer records in Hong Kong, by CUA's various parent entities' compliance with Chinese cybersecurity and intelligence laws, and by CUG's ability to remotely configure CUA's network.

Finally, the Committee letter stated that, based on the above concerns, "as well as those identified in the [Committee's] recommendations for [other] . . . similarly situated companies, it does not appear that a mitigation

agreement with CUA would be feasible" to assuage the national security risks associated with CUA's ongoing retention of its § 214 certificates.

The FCC afforded CUA an opportunity to respond to the Committee's letter. CUA filed a response, noting that the letter did not specifically recommend revoking CUA's § 214 certificates and contending that the letter only offered general observations about Chinese law and policies, the conduct of other Chinese government-owned companies, and U.S. policy toward China. Furthermore, CUA argued, the letter did not allege any specific misconduct by CUA and therefore could not serve as the basis for revoking its § 214 certificates.

**2**

After assessing the responses received as a result of the *Order to Show Cause*, the FCC on March 19, 2021 issued an order instituting proceedings to determine whether to revoke CUA's § 214 certificates. *See China Unicom (Ams.) Operations Ltd.*, 36 FCC Rcd. 6319 (2021) (hereinafter "*Institution Order*").

In its order, the FCC stated that CUA's responses thus far had been insufficient to demonstrate that it was "not susceptible to the exploitation, influence, or control of the Chinese government." *Institution Order*, 36 FCC Rcd. at 6335 ¶ 26. The FCC also stated that CUA's "representations to the Commission and to other U.S. government agencies" raised additional concerns about its candor because CUA had "omitted crucial information" in its responses to the FCC "that was disclosed to the Senate [PSI] and published in the PSI Report" and CUA had "failed to fully respond to several questions posed by the *Order to Show Cause*." *Id*. at 6353 ¶ 49; *see also supra* note 8. In light of these asserted

discrepancies, the *Institution Order* specifically requested descriptions of "policies or agreements concerning [CUA's] corporate governance," information on the storage and accessibility of U.S. customer records, descriptions of policies to protect such information, and explanations of the discrepancies and omissions in CUA's statements. *Institution Order*, 36 FCC Rcd. at App'x A. The *Institution Order* also noted that, while CUA admitted in its response to the *Order to Show Cause* that it had not filed the missing transfer-of-control notification, CUA still had not yet taken any steps to correct its error by retroactively filing the notification.[9] *See Institution Order*, 36 FCC Rcd. at 6356 ¶ 55.

The *Institution Order* set forth the following procedures for the proceeding: (1) the FCC afforded CUA 40 days to answer 13 additional questions the Commission asked, as well as to provide arguments and evidence in written submissions supporting its position that the § 214 certificates should not be revoked; (2) the Executive Branch agencies and the public would have 40 days to respond to CUA's response; and (3) CUA would have an additional 20 days to provide further evidence or arguments in support of its position. *See* 36 FCC Rcd. at 6320 ¶ 1. The order went on to outline the FCC's asserted grounds for revoking CUA's § 214 certificates, including national security concerns specific to CUA as well as CUA's alleged lack of candor and trustworthiness before the Commission. *See id*. at 6321–23 ¶¶ 3–4, 6334–57 ¶¶ 24–56. The FCC also

---

[9] Indeed, even after the *Institution Order* again pointed out this omission, it would take CUA until September 8, 2021—nearly a year and a half after the FCC first informed CUA of the problem—to retroactively file the necessary paperwork.

explained that the procedures it was adopting complied with due process and FCC regulations and that a formal hearing before an administrative law judge ("ALJ") was not necessary and would not be helpful to the resolution of the matter. *See id*. at 6328–33 ¶¶ 16–23.

CUA filed a 49-page response, in which it again reiterated its arguments that the FCC lacked the authority to revoke its § 214 certificates absent a demonstration of serious misconduct and that CUA was entitled to a formal hearing as to whether its certificates should be revoked.

Regarding the allegations that CUA had not been forthcoming in its responses to certain questions posed in the *Order to Show Cause* and that it had provided different information regarding its ownership and management to the Senate PSI, CUA argued that any discrepancies did not reflect an intent to mislead the FCC, but were instead attributable to the FCC assertedly having asked for—or CUA having understood the FCC as asking for—different information than what the Senate PSI had requested. Of particular interest to the FCC was CUA's failure to disclose the existence of a confidentiality agreement between CUA and CUG that governed access to American records and network information. *See Institution Order*, 36 FCC Rcd at 6354 ¶ 51. CUA, for its part, argued that it had not understood the FCC's questions regarding ownership and corporate governance to be soliciting information about this agreement, which CUA had previously provided to the Senate PSI during the drafting of the PSI Report.

**3**

In February 2022, the FCC issued an order revoking CUA's § 214 domestic and international certificates. *See China Unicom (Ams.) Operations Ltd.*, 37 FCC Rcd. 1480

CHINA UNICOM (AMERICAS) OPS. v. FCC          23

(2022) (hereinafter "*Revocation Order*").  The FCC found that CUA had failed to dispel the national security concerns arising from its ultimate Chinese government ownership and that CUA had demonstrated a lack of candor and trustworthiness in its representations to the Commission.  *Id*. at 1481 ¶ 2.  The FCC therefore concluded that revocation was warranted.  *See id*. at 1480–81 ¶¶ 1–2, 1508–09 ¶ 49.

First, the *Revocation Order* affirmed that one of the purposes of the Communications Act is to help protect "the national defense," and that therefore, as part of the "public interest analysis" that the FCC undertakes to ensure that § 214 certificates comport with "the present or future public convenience and necessity," the FCC has long considered "national security" and "foreign policy concerns" related to a carrier's foreign ownership.  37 FCC Rcd. at 1481–83, ¶¶ 3–5 (emphasis omitted).  The FCC determined that revocation of CUA's § 214 certificates on the basis of national security concerns was amply supported by the record.  *See id*. at 1494–95 ¶¶ 25–26, 1508–33 ¶¶ 49–77.

The FCC also "reject[ed] CUA's various procedural arguments," finding that its approach was "consistent with principles of due process and applicable law and provided CUA with sufficient notice and several opportunities to be heard."  *Revocation Order*, 37 FCC Rcd. at 1497 ¶ 29.  Specifically, the FCC determined that neither its own regulations and precedent nor the dictates of due process under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), required a formal evidentiary hearing and that a written evidentiary record was sufficient to decide the case.  *See Revocation Order*, 37 FCC Rcd. at 1497–1500 ¶¶ 31–36.

The *Revocation Order* then discussed CUA's ownership and management in detail, ultimately concluding that CUA

is indirectly owned by the Chinese government.  *See* 37 FCC Rcd. at 1484–86 ¶ 7, 1509 ¶ 50.

Next, the FCC summarized how the Executive Branch agencies' national security concerns regarding CUA's Chinese government ownership were amplified by certain Chinese intelligence and cybersecurity laws[10] that potentially could be used to obtain CUA's compliance with Chinese government requests for information, such as communication intercepts and identifying information about U.S. customers.  *See Revocation Order*, 37 FCC Rcd. at 1521–22 ¶ 64, 1539–40 ¶¶ 83–85.  Thus, the FCC concluded "that CUA's retention of section 214 authority presents national security and law enforcement risks that warrant revocation."  *Id*. at 1530 ¶ 74.

The FCC also revoked the certificates on the alternative ground that CUA's responses to the Commission throughout the proceedings had demonstrated a lack of candor and trustworthiness.  *See Revocation Order*, 37 FCC Rcd. at 1555 ¶ 111.  The FCC determined that, among other things, "CUA failed to provide the Commission with crucial information" regarding its ownership structure, board of directors' CCP membership, the involvement of its parent and other related entities in its management and operations, and the existence of a relevant confidentiality agreement, despite specific requests for such information.  *Id*.  On the record, the FCC concluded that "CUA cannot be trusted to cooperate with the Commission or the Executive Branch agencies, to comply with the Commission's rules, and, importantly, to assist with the Commission's statutory

---

[10] These laws included the 2017 Cybersecurity Law, the 2017 National Intelligence Law, the 2018 Cybersecurity Regulation, and the 2019 Cryptography Law.  *Revocation Order*, 37 FCC Rcd. at 1524 ¶ 67.

obligations to act 'for the purpose of the national defense [and] for the purpose of promoting safety of life and property.'" *Id*. at 1556 ¶ 111 (quoting 47 U.S.C. § 151).

Finally, the FCC found that mitigation measures, including those proposed by CUA in its responses, "would not address the significant national security and law enforcement concerns present in this case." *Revocation Order*, 37 FCC Rcd. at 1563 ¶ 124. The FCC again noted its "longstanding policy of according deference to the Executive Branch agencies' expertise in identifying and mitigating risks to national security" and "in monitoring carriers' compliance with risk mitigation agreements." *Id*. The *Revocation Order* then explained that the FCC agreed with the Committee's assessment that, "given CUA's relationship with the [Chinese] government and the significant national security and law enforcement concerns resulting from that relationship," "the underlying foundation of trust that is needed for a mitigation agreement of this type to adequately address national security and law enforcement concerns is not present," and so "the opportunity for effective mitigation with CUA is illusory at best in the current national security environment." *Id*.

In light of the foregoing, the FCC ordered that CUA's domestic and international § 214 certificates be revoked and that CUA discontinue all services provided pursuant to § 214 within 60 days. *See Revocation Order*, 37 FCC Rcd. at 1568 ¶¶ 135–36.

## D

CUA timely filed its petition for review of the FCC's revocation order, naming as respondents both the FCC and the United States. We have jurisdiction under 28 U.S.C. §§ 2342(1) and 2343. CUA subsequently filed an

emergency request for a temporary stay and a motion to stay. This court denied both the request and the motion on March 4, 2022.

## II

At the outset, CUA argues that, as a matter of law, the FCC lacks any statutory authority to revoke a § 214 certificate, except as a penalty imposed in connection with adjudicated violations of applicable law. On that basis, CUA asks us to set aside the FCC's revocation order as being "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). In its answering brief, the FCC asked us, in reviewing this issue, to defer to the FCC's interpretation of the Communications Act under *Chevron U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). However, the Supreme Court recently overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2272–73 (2024), and we therefore "must exercise [our] independent judgment in deciding whether [the] agency has acted within its statutory authority." *Id*. at 2273. Accordingly, we review de novo whether the FCC correctly interpreted the scope of its authority under the Communications Act. *Id*. at 2261.

## A

As noted earlier, § 214 of the Communications Act provides that no common carrier "shall acquire or operate" or "construct[]" any telecommunications line without first obtaining the necessary certificate from the FCC authorizing the carrier to engage in such acquisition, operation, or construction. 47 U.S.C. § 214(a). The FCC's power to grant such certificates is set forth in § 214(c), which provides, in relevant part, as follows:

> The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require.

*Id*. § 214(c).  In addition to this and other specific authorities, the FCC has been given, in § 4(i) of the Act, a general ancillary authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with [the Act], as may be necessary in the execution of its functions."  *Id*. § 154(i).

CUA argues that, because § 214 expressly refers only to a power to "issue" a certificate, to "refuse to issue" a certificate, or to "attach" conditions to "the issuance of the certificate," the FCC has not been granted the power to *revoke* a certificate.  *See* 47 U.S.C. § 214(c).  For multiple reasons, we do not believe that this is a reasonable reading of the statute.  Rather, as we shall explain, the statute's grant of authority to "issue" certificates to telecommunications carriers must be understood as carrying with it an implied incidental authority to revoke such documents.  *See Haig v. Agee*, 453 U.S. 280, 290–91 (1981) (holding that the State Department's statutory authority to "grant and issue passports" included an implied authority to revoke passports (citation omitted)); *cf. Myers v. United States*, 272 U.S. 52, 164 (1926) (stating that "the President's power of removal is

further established as an incident to his specifically enumerated function of appointment by and with the advice of the Senate, but that such incident does not by implication extend to removals the Senate's power of checking appointments").

As an initial matter, CUA's argument—that a power to *revoke* certificates cannot be found to exist unless it is specifically and expressly recited in the statute—completely ignores the concept of implied ancillary authorities and, in doing so, ultimately proves too much.  If Congress's failure to include an express power to "revoke" a certificate truly means that the agency lacks such a power, the result would be that once a certificate is issued, it would be like the proverbial edict under "the law of the Medes and the Persians, which cannot be revoked." *Daniel* 6:8 (RSV).  Even CUA does not endorse this extreme position, because it acknowledges that the agency can revoke a certificate as "an enforcement penalty for misconduct."  However, this is a larger concession than CUA appears to realize, because CUA does not identify any provision of the Act that expressly allows revocation of certificates as a punishment for misconduct.  Section 214 contains provisions allowing for judicial injunctive relief against violations of the Act and for administrative imposition of monetary penalties, but it says nothing about revoking a certificate as a penalty.  *See* 47 U.S.C. § 214(c), (d).  Indeed, when the FCC has had occasion to explain the source of its authority to revoke a certificate as a penalty, it has identified its general authority under § 4(i) of the Communications Act.  *See CCN, Inc.*, 13 FCC Rcd. 13599, 13607 ¶ 12 (1998) (invoking its "authority under Section 4(i) of the Act" in revoking the certificate of carriers who engaged in "egregious actions and blatant violation[s] of [FCC] rules and the Act").  But if the FCC's

power to revoke certificates as a penalty rests on its ancillary authority to "perform any and all acts," and "issue such orders, . . . as may be necessary in the execution of its functions," 47 U.S.C. § 154(i), then it is hard to see why the agency's exercise of an ancillary revocation authority would be strictly limited to *only* the penalty context.  Nothing in the language of the statute supports such a limitation, and, as a result, CUA's argument itself becomes atextual.

More generally, CUA errs to the extent that it attaches talismanic significance to Congress's omission of an express power to revoke a certificate.  The point is illustrated by *Haig v. Agee*, in which the Supreme Court faced a comparable interpretive issue.  Specifically, the Court there addressed whether the State Department "has authority to revoke a passport on the ground that the holder's activities in foreign countries are causing or are likely to cause serious damage to the national security or foreign policy of the United States."  453 U.S. at 282.  After Agee, a former covert CIA operative, engaged in a variety of activities overseas that publicly opposed the CIA and that sought to "expose CIA officers and agents," *id*. at 283, the State Department revoked his passport on the ground that Agee's "activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States," *id*. at 286.  Agee sued the Secretary of State, and the district court granted him summary judgment, ordering his passport to be restored.  *Id*. at 287–88.  A divided panel of the D.C. Circuit affirmed, holding that there was "no express statutory authorization for the revocation," nor any "'substantial and consistent' administrative practice" of such revocations.  *Id*. at 288 (citation omitted).  The Supreme Court reversed.  *Id*. at 310.

The Court noted that the language of the Passport Act, which had been unchanged since 1926 and materially unchanged since 1874, *Agee*, 453 U.S. at 290 n.18, stated, in relevant part, that the "Secretary of State may *grant and issue* passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States," *id*. at 290 (quoting 22 U.S.C. § 211a (emphasis added)).  Because the relevant language only referred to "grant[ing] and issu[ing] passports," the Court acknowledged that the "Passport Act does not in so many words confer upon the Secretary a power to *revoke* a passport." *Id*. (emphasis added).  However, contrary to the sort of simplistic argument that CUA makes here, the Court concluded that this omission did not preclude recognition of a revocation power generally or of a specific revocation power based on national security concerns.  *Id*. at 290–91.  For one thing, neither the Passport Act nor any other statute "expressly limit[s]" the exercise of a power to revoke a passport.  *Id*. at 290.  Moreover, giving decisive weight to the statute's omission of any express revocation power would prove too much, the Court held, because the statutory language also did not "expressly authorize *denials* of passport applications."  *Id*. (emphasis added) (footnote omitted).  The Court stated that it had already "recognized congressional acquiescence in Executive policies of *refusing* passports to applicants" participating in a variety of illegal conduct, and the Court perceived no basis for concluding that a comparable *revocation* authority did not exist.  *Id*.  Indeed, the Court noted that Agee ultimately "concede[d] that if the Secretary may deny a passport application for a certain reason, he may revoke a passport on the same ground." *Id*. at 291.

Having thus recognized that the Secretary possessed some measure of revocation authority, the Court turned to the question whether the Secretary could exercise that authority based specifically on national security grounds. *See Agee*, 453 U.S. at 291–306. Exhaustively surveying the administrative practices and policies on this point over many decades, the Court held that the State Department's assertion that it possessed regulatory power to revoke passports based on national security concerns had been "'sufficiently substantial and consistent' to compel the conclusion that Congress ha[d] approved it." *Id*. at 306 (citation omitted). That was true, the Court held, even though there were very few examples that such a power had actually been exercised. *Id*. at 301–03. The Court then proceeded to reject all of Agee's constitutional challenges to the revocation and to the procedures by which it was accomplished. *Id*. at 306–10. The Court therefore reversed the D.C. Circuit's judgment. *Id*. at 310.

*Agee* further confirms what common sense already suggests, which is that a statutory grant of agency authority to "issue" an authorizing document may carry with it an implied ancillary grant of authority to "deny" and to "revoke" such documents. Whether such an authority has been granted generally, and if so whether it may be exercised on particular grounds, will turn, as in *Agee*, on the details of the statutory scheme and, perhaps, the relevant administrative practice. *See Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) ("The formula the government urges, that what one can do, one can undo, is sometimes true, sometimes not."). But the mere fact that the Communications Act here refers only to an express power to "issue" or to "refuse to issue" a certificate is not dispositive.

## B

We turn, then, to whether there is any other indication in the statutory text or structure that Congress denied the FCC any relevant authority to revoke a carrier's § 214 certificate. We find none.

## 1

Relying on *United States v. Seatrain Lines, Inc.*, 329 U.S. 424 (1947), which held that the Interstate Commerce Commission ("ICC") lacked the authority to partially revoke a certificate issued to a "water carrier" under Part III of the Interstate Commerce Act ("ICA"), *id*. at 426–28, CUA argues that the FCC's authority under § 214 should similarly be construed as lacking a general authority to revoke certificates after they have been issued.  The analogy is unpersuasive, because the distinctive features of the ICA that led to the Court's holding in *Seatrain* are absent from the Communications Act.

## a

In *Seatrain*, a company (Seatrain) that "long ha[d] been a common carrier of goods by water" applied for, and received from the ICC, the "certificate" required under § 309(a) of Part III of the ICA to authorize the company to carry commodities along specified shipping routes. 329 U.S. at 425–27. Some 20 months later, in January 1944, the ICC *sua sponte* reopened the proceedings concerning Seatrain's certificate in order to determine whether Seatrain's authorization to carry commodities along those routes should be narrowed.  *Id*. at 427.  Seatrain took the position that the ICC "was without statutory authority to make the alteration proposed," and it therefore "declined to offer evidence" concerning the ICC's inquiry into altering the

certificate. *Id*. The ICC "entered an order canceling the former certificate and directing that a different one be issued." *Id*. The new certificate "in effect deprived Seatrain of the right to carry goods generally between the ports it served" and instead "limited it[s] . . . operations" to only certain specified types of carriage of goods. *Id*. A three-judge district court held that the ICC lacked the authority to alter the certificate and that, even if it did have such authority, the ICC "should not have done so in this case where, as the [district] [c]ourt found from evidence before it but which had not been before the [ICC], Seatrain had expended large sums of money in reliance upon the complete validity of its certificate." *Id*. at 427–28. The Supreme Court affirmed, agreeing that the ICC "was without authority to cancel this certificate." *Id*. at 428.

As an initial matter, the Court rejected the ICC's argument that the alteration of Seatrain's certificate fell within the scope of a permissible exercise of a "power to correct clerical mistakes." *Seatrain*, 329 U.S. at 428. Reviewing the relevant circumstances, the Court concluded that "it seems apparent that the Seatrain proceedings were reopened not to correct a mere clerical error, but to execute [a] new policy" concerning the "carriage of . . . freight cars" announced by the ICC in a December 1943 decision in another case. *Id*. at 429.

Turning to the question of the ICC's statutory authority to cancel a certificate, the Court noted that the "water carrier provisions are part of the general pattern of the [ICA] which grants the [ICC] power to regulate railroads and motor carriers as well as water carriers." *Seatrain*, 329 U.S. at 429–30 (footnote omitted). The Court found it significant that, although the ICA authorized the ICC "to issue certificates to all three types of carriers," the ICC was "specifically

empowered to revoke *only* the certificates of motor carriers."
*Id*. at 430 (emphasis added).  As the Court explained, this
notable difference in the statutory language governing the
three types of carriers appears to have been intentional:

> In fact, when the water carrier provisions
> were pending in Congress, the Commission's
> spokesman, Commissioner Eastman, seems
> specifically to have requested the Congress to
> include no power to revoke a certificate.  The
> Commissioner explained that while the
> power to revoke motor carriers' certificates
> was essential as an effective means of
> enforcement of the motor carrier section, it
> was not necessary to use such sanctions in the
> regulation of water carriers.

*Id*.  In a footnote, the Court quoted Commissioner Eastman's
express statement that the ICC did not believe that it needed
a similar revocation authority with respect to water carriers:

> While there is room for argument, we are
> inclined to believe that provision for the
> revocation or suspension of water carrier
> certificates or permits is not essential, if
> adequate penalty provisions are provided for
> violations of part III.   Revocation or
> suspension, in the case of motor carriers, is
> believed to be the most effective means of
> enforcement, since there are so many such
> carriers, and the operations of the great
> majority are so small, that enforcement
> through penal actions in courts presents many

> practical difficulties; but this is not true of water carriers.

*Id*. at 430 n.4 (citation omitted).  The Court further noted that the ICC itself had taken the view that, apart from the express statutory revocation authority granted with respect to motor carriers, the ICC lacked any authority to revoke motor-carrier certificates under its "general statutory power[s]." *Id*. at 430–31.

The Court next addressed, and rejected, the argument that the ICC's "statutory power under § 309(d)" of the ICA "to fix 'terms, conditions, and limitations' for water carrier certificate holders" allowed it to narrow the terms of Seatrain's certificate.  *Seatrain*, 329 U.S. at 431.  This argument failed, the Court concluded, because any such authority to impose terms and conditions after a certificate had been granted "is certainly no greater than the Commission's authority to limit the type of service *when issuing the original certificate*."  *Id*. (emphasis added). Again comparing the notable differences in the respective provisions of the ICA governing motor carriers and water carriers, the Court held that the provisions governing water carriers appeared affirmatively to "preclude" the ICC from attaching to a certificate the sort of limitations at issue in *Seatrain*.  *Id*.  Given that the ICC apparently lacked the authority to impose such limitations as an exercise of its power to impose terms and conditions "when issuing the original certificate," any authority to *amend* those terms and conditions could not justify the ICC's narrowing of Seatrain's certificate.  *Id*. at 431–32.

Finally, the Court rejected the ICC's argument that its statutory authority to "suspend, modify, or set aside its orders" under Part III allowed it to alter Seatrain's

certificate. *Seatrain*, 329 U.S. at 432 (citation omitted). The Court held that this argument failed because the statutory context made clear that a "certificate" was not an "order" within the meaning of that provision. *Id*. Accordingly, the Court held that a water-carrier certificate under the ICA was "not subject to revocation in whole or in part except as specifically authorized by Congress." *Id*. at 432–33.

**b**

None of the arguments that led the *Seatrain* Court to reject the ICC's asserted power to cancel a water-carrier certificate apply here.

Unlike in *Seatrain*, there is no suggestion in the text of the Communications Act that Congress intentionally withheld revocation authority from one type of comparable common-carrier certificate while expressly granting it with respect to another. In arguing to the contrary, CUA points to the fact that the separate title of the Communications Act dealing with radio licensing (Title III) contains a provision expressly empowering the FCC to "revoke any station license" for a variety of reasons, including "because of conditions coming to the attention of the [FCC] which would warrant it in refusing to grant a license . . . on an original application." 47 U.S.C. § 312(a)(2). We reject CUA's proffered analogy between the referenced provisions of the Communications Act and the distinct provisions of the ICA cited in *Seatrain*.

In our view, no negative inference can be drawn from the fact that the "radio" licensing provisions in Title III of the Communications Act contain an express revocation provision, while the common-carrier certificate provisions in Title II do not. As the Supreme Court has noted, the two distinct regulatory systems established under Title II and

Title III are very different, because, in "contradistinction" to wire-telecommunications carriers, the Act recognizes that "broadcasters are not common carriers and are not to be dealt with as such." *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940) (footnote omitted). In sharp contrast to the otherwise similar common-carrier regimes created for water carriers and motor carriers under the ICA at issue in *Seatrain*, there is no basis for concluding that the very different systems reflected in Title II and Title III of the Communications Act should comparably be read *in pari materia*. Indeed, given that broadcast licenses are generally issued for *fixed*, renewable terms of up to eight years, *see* 47 U.S.C. § 307(c)(1), the statute reflects a clear temporal expectation that, absent contrary indication in the statutory text, such a license will *endure* for the length of that term. The use of a fixed term is thus affirmatively inconsistent with positing an implied power to revoke a license at any time, and it is therefore unsurprising that Title III contains a provision expressly recognizing an agency power of revocation. By contrast, as noted earlier, Title II's silence on the temporal duration of common-carrier certificates, which have traditionally been open-ended in length, is a factor that weighs in *favor* of an implied power of revocation.

Moreover, unlike in *Seatrain*, the FCC's authority in "issuing the original certificate" *does* include the authority to deny it on the grounds invoked by the agency here. The Communications Act identifies the "national defense" as one of the objectives of the Act that the FCC should consider in evaluating the public interest, *see* 47 U.S.C. § 151, and § 214 underscores the point by stating that applications for certificates must be shared with the Defense and State Departments and that the views of those additional agencies

must be considered, *id*. § 214(b).  Unlike *Seatrain*, in which the ICC sought to use its general conditioning authority to limit certificates on grounds it could not have invoked "when issuing the original certificate," 329 U.S. at 431, this is not a situation in which the agency is attempting to use a general authority to smuggle into the regulatory scheme a non-statutory factor that is at odds with Congress's crafting of that scheme.  *See Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 333 n.15 (1961) (noting that *Seatrain*'s "holding may rest on an alternate ground—*viz.*: that the [ICC] had no power to impose the conditions it did in the first instance");[11] *Murphy Oil Corp. v. FERC*, 589 F.2d 944, 947 (8th Cir. 1978) (stating that *Seatrain* "rested heavily on the Court's doubt that the ICC would have had, in the first instance, statutory authority to take the action it did" (citation omitted)).

CUA's analogy to Title III of the Communications Act presents other interpretive difficulties.  The revocation provision in Title III authorizes revocation, not only on grounds that would warrant denial of an original application, but also upon a half-dozen other grounds, including "willful or repeated" violations of the FCC's rules.  47 U.S.C. § 312(a)(4).  If, as CUA contends, the textual distinctions between Title III and Title II mean that the express revocation authority set forth in Title III must be understood as having been affirmatively withheld from Title II, then the FCC would be unable to exercise revocation authority under Title II even based on repeated rules violations.  As noted

---

[11] In noting that this alternative ground for *Seatrain*'s holding is *also* inapplicable here, we do not, as the dissent wrongly contends, conclude that *Seatrain*'s holding is "limited" to this "alternate holding."  *See* Dissent at 82–83.  Rather, our point is that *both* of the rationales discussed in *Seatrain* are inapplicable here.

earlier, CUA itself is unwilling to embrace that extreme position, even if it is the logical consequence of its simplistic approach to the Communications Act's text.

CUA alternatively argues that, because the Title II common-carrier regulations were themselves crafted by "analogy to the regulation of rail and other carriers" in the ICA, *see Sanders Bros.*, 309 U.S. at 474, we should attach controlling weight to the contrast between the *motor-carrier* provisions of Part II of the ICA and the wire-telecommunications-carrier provisions of the Communications Act. But as we have explained, *Seatrain*'s conclusion that the *water-carrier* provisions of the ICA did not include a revocation power rested dispositively on the facts that (1) the textual distinction drawn *within* the ICA between the motor-carrier provisions and the water-carrier provisions was intentional; and (2) the ICC had affirmatively informed Congress that it did not need revocation authority in the water-carrier context. The mere fact that, when enacted in 1934, the Communication Act's provisions governing wire-telecommunications-carrier certificates were modeled on the ICA's 1920 railroad-certificate provisions does not support transposing *Seatrain*'s highly context-specific reading of the water-carrier provisions of the ICA to the very different context of Title II of the Communications Act. The specific reasons *Seatrain* gave for that reading of the ICA's water-carrier provisions simply do not apply to § 214.

**2**

An agency's assertion of an implied general revocation authority may also be sharply limited, or even foreclosed, when the statutory structure negates that assertion of implied authority. *See American Methyl Corp. v. EPA*, 749 F.2d 826,

835 (D.C. Cir. 1984).  That may be the case, for example, when there is a specific statutory *process* for altering an agency's grant of a certificate, waiver, or other authorization.  *See id*.  Where Congress has provided a particular mechanism, with specified procedures, for an agency to make such alterations, "it is not reasonable to infer" an implied authority that would allow an agency to circumvent those statutory procedural protections.  *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (citation omitted); *see also Delta Air Lines*, 367 U.S. at 334 (holding that "agencies desiring to change existing certificates must follow the procedures 'specifically authorized' by Congress and cannot rely on their own notions of implied powers in the enabling act" (quoting *Seatrain*, 329 U.S. at 433)).**[12]**

But CUA neither contends that the Communications Act sets forth any such specific *statutory* procedures for revoking a certificate, nor has it pointed to any such procedural

---

[12] In a footnote, *Delta Air Lines* suggested in dicta that the agency in *Seatrain* actually "could have reached with impunity the result it wanted to reach by following the procedures set out by Congress."  367 U.S. at 333 n.15.  Under this further alternative reading of *Seatrain*, the ICC assertedly *did* have *implied* revocation authority (pursuant to its general powers of reconsideration), but it simply failed to follow the proper statutory procedures to invoke that authority.  Contrary to what the dissent posits, *see* Dissent at 83–85  & n.17, this reading of *Seatrain* does not support CUA's position.  As we explain later, the FCC here properly followed the procedures that are applicable to its exercise of its revocation authority, *see infra* Section IV, and so this is not a situation in which the agency has sought to invoke implied authority in order to evade the *procedural* protections applicable to such action.  Indeed, CUA's position is that the FCC simply lacks the substantive authority to revoke its certificates on national security grounds, *regardless* of what procedures are used.

provision in the Act that the FCC would supposedly evade if it were held to have implied revocation authority here. On the contrary, CUA's procedural arguments are based on the assertion that, *if* the FCC has implied revocation authority under the Communications Act, then any given exercise of that authority must comply with (1) the particular FCC *regulations* that CUA contends would then be applicable; and (2) the provision of the APA that generally applies to any decision to revoke a license, *see* 5 U.S.C. § 558. *See infra* Section IV. Because the procedural provisions invoked by CUA are generic ones that only come into play if there is *already* an independent source of revocation authority, they do not constitute the sort of *specific statutory mechanism for revocation* that might preclude recognition of an implied revocation power. Put simply, if there is no statutory procedure for revocation that the agency could be said to be evading by relying on implied authority, then the entire predicate for the sort of statutory-structure argument referenced in *American Methyl* is lacking.

### 3

Examining the relevant provisions of the Communications Act for any other pertinent textual clues, we are further reinforced in the correctness of our view that the FCC has the authority to revoke a § 214 certificate based upon national security grounds.

As noted above, the statute instructs the FCC, in evaluating an initial application for a § 214 certificate, to consider the "national defense" and to consult with the Departments of Defense and State. That national defense factor would be considered as part of the FCC's statutory directive to determine whether "the present *or future* public convenience and necessity [may] require" the requested

authorization.   47 U.S.C. § 214(a) (emphasis added).   It would be a strange reading of this provision to conclude that, while the agency must, in issuing certificates, consider expectations concerning the "future" public convenience and necessity, it may never consider subsequent changes in such circumstances as that "future" plays out.   The conditions surrounding the telecommunications industry, and the various players within it, can be expected to change, including with respect to national security considerations, and a sclerotic view of the agency's authority is affirmatively inconsistent with the statute's declared purpose.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 33, 63 (2012) (explaining that a "textually permissible interpretation that furthers rather than obstructs the document's purpose"—which is "to be gathered only from the text itself"—"should be favored").[13]

*          *          *

Accordingly, we hold that the FCC possesses statutory authority to revoke a § 214(a) certificate by invoking grounds that it may properly consider in denying issuance of such a certificate as an original matter.  Of course, any actual exercise of such authority must consider the relevant constraints that may be placed upon that action by the Constitution, other statutes, or applicable principles of

---

[13] Finally, although it is not necessary to our holding, the FCC's authority to attach appropriate "terms and conditions" to § 214 certificates, *see* 47 U.S.C. § 214(c), provides further support for recognizing such a revocation authority here.  Both the *Domestic Blanket Order* and the *Foreign Participation Order* that underlie CUA's certificates explicitly mention and assert a revocation authority on the part of the FCC.  *See* *Domestic Blanket Order*, 14 FCC Rcd. at 11372 ¶ 12, 11374 ¶ 16; *Foreign Participation Order*, 12 FCC Rcd. at 23900 ¶ 19, 24022 ¶ 295.

administrative law. In some cases, such as ones involving substantial reliance interests, those constraints may be significant and may preclude a particular exercise of such authority.

## III

Here, CUA argues that the FCC's case-specific exercise of revocation authority does in fact violate various other provisions of law. In addressing these challenges, we first consider CUA's contention that the revocation order here should be set aside under the APA on the grounds that it was arbitrary and capricious and that its factual conclusions were not supported by substantial evidence. *See* 5 U.S.C. § 706(2)(A).

Our review under these APA standards "is deferential," and we "may not substitute [our] own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The "arbitrary and capricious" standard limits us to "ensur[ing] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) ("Our only task is to determine whether the Commission has considered the relevant factors and articulated a rational connection between the facts found and the choice made."). We review the factual findings underlying the agency's decision for substantial evidence, *see Center for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 598 (9th Cir. 2021), and we must uphold them if "a reasonable mind might accept [this] particular evidentiary record as adequate to support [the agency's] conclusion," *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (simplified).

Applying these standards to the FCC's two alternative grounds for revoking CUA's certificates, we reject CUA's contentions.

## A

The FCC's decision to revoke CUA's certificates based on national security concerns was reasonable and supported by substantial evidence.

The FCC's revocation order lays out in detail the particular national security risks and threats posed by CUA's continued retention of its § 214 certificates.  The relevant Executive Branch agencies explained how the national security situation has changed over the last two decades vis-à-vis China, which now represents an increased threat to the United States in terms of potential economic espionage, cyberattacks, and intelligence-gathering efforts. *Revocation Order*, 37 FCC Rcd. at 1530–33 ¶¶ 74–76.  Substantial evidence supports the FCC's conclusion that CUA's ultimate Chinese government ownership as well as the significant overlap among its board members with those of its parent entities and the CCP itself leave it particularly vulnerable to Chinese government influence, exploitation, and control. *See id*. at 1510–12 ¶¶ 52–53, 1518–21 ¶¶ 61–62.

Furthermore, the FCC properly concluded that there are "significant concerns" that recently enacted Chinese cybersecurity and intelligence laws could require Chinese companies, including CUA's indirect parents, to assist the Chinese government's intelligence-collection efforts. *Revocation Order*, 37 FCC Rcd. at 1521–29 ¶¶ 64–72. Although CUA insists that it is not itself directly subject to these laws, the agency permissibly concluded that CUA's ownership by entities that indisputably are subject to such

laws presents a material national security risk to the United States. *Id*. at 1523–28 ¶¶ 66–70. The FCC explained that CUA's infrastructure and capabilities provide "CUA, its controlling parent entities, and therefore the Chinese government, with numerous opportunities to access, monitor, store, disrupt, and/or misroute U.S. communications in ways that are not authorized and that can facilitate espionage and other activities harmful to U.S. national security and law enforcement interests." *Id*. at 1530 ¶ 74. As the FCC noted, the record indicates that this could include the collection or disruption of even some U.S. government communications to international destinations. *See id*. at 1534–35 ¶ 78, 1551 ¶ 102.

Moreover, the record supports the FCC's conclusion that CUA's U.S. customer records are held overseas in Hong Kong and can be accessed by its direct parent, CUG. *See Revocation Order*, 37 FCC Rcd. at 1513 ¶ 55. The FCC further noted that at least one other affiliated Hong Kong company, China Unicom (Hong Kong) Operations Limited ("CUHK Operations"), also has access to these U.S. customer records, and CUA failed to explain its relationship with CUHK Operations or why it has access to CUA's records. *See id*. at 1514–16 ¶¶ 57–58. CUA's network infrastructure also provides it with the capability and opportunity "to access, monitor, store, disrupt, and/or misroute U.S. communications," *id*. at 1551 ¶ 102, including U.S. government communications, *id*. at 1535 ¶ 78, "in ways that are not authorized and that can facilitate espionage and other activities harmful to U.S. national security and law enforcement interests," *id*. at 1530 ¶ 74. This risk is not theoretical; CUA relies on the network operation center of its parent entities in Hong Kong for technical support, and

its network can be reconfigured remotely from Hong Kong. *See id*. at 1513 ¶ 55.

CUA failed to adequately address the fact that its indirect parent entities were required to comply with Chinese laws and government directives, including certain Chinese cybersecurity and intelligence laws.   Further, CUA represented that "none of CUG's senior management or members of its board of directors are *affiliated with* or appointed by the Chinese government" (emphasis added), but that statement is misleading.  CUA disclosed elsewhere in its response to the *Order to Show Cause* that CUG board directors were members of the CCP, which the agency reasonably construed to be an "affiliation" with the Chinese government. *See Institution Order*, 36 FCC Rcd. at 6337– 39 ¶ 28.  And although CUA argued that its and its parents' compliance with U.S. and Hong Kong laws, respectively, along with recently increased private investment in CUHK, demonstrate "independent governance," CUA never refuted the claim that its ultimate parent, CU, was owned and controlled by the Chinese government.

Regarding the FCC's request for clarification as to the difference between CUA's representation that CU indirectly held only a 52.1% equity interest in CUHK and CUHK's 2020 SEC filing stating that CU indirectly owned 79.9% of CUHK, CUA provided a revised chart of its ownership chain. *Revocation Order*, 37 FCC Rcd. at 1485 n.22, 1560– 61 ¶¶ 119–20.   However, CUA offered no satisfactory explanation for this discrepancy and failed to provide a clear breakdown of the ownership percentages that illustrate CU's ultimate ownership percentage of CUHK. *See id*.  And while CUA now argues that the ownership chart it provided in response to the *Institution Order* clearly showed that CU actually owned 79.9% of CUHK, the agency properly

concluded that this was *not* in fact clear, as the chart depicted intermediate ownership steps between CUHK and CU without identifying the percentages ultimately controlled by CU. *See id*.

Further, on this record, the FCC permissibly concluded that, "[c]ontrary to CUA's claims, CUG does not simply provide input on 'major decisions'; rather, CUG's control is much broader due to its role in CUA's decision making, provision of services, and access to and maintenance of U.S. customer records." *Revocation Order*, 37 FCC Rcd. at 1510 ¶ 52 (footnotes omitted). Moreover, as noted, CUA was not initially candid about the extensive overlap among its directors and management and those of CUG, CUHK, and CU, the vast majority of whom are CCP members. *Id*. at 1511–12 ¶ 53, 1520–21 ¶ 62. Finally, CUHK's SEC filings reported that CU "is effectively able to control [CUHK's] management, policies and business by controlling the composition of [CUHK's] board of directors and, in turn, indirectly controlling the selection of [its] senior management." *Id*. at 1485 n.22.

This extensive "integrated presence" of the CCP in CUA's ownership and management made concrete the FCC's "concerns with CUA's ownership and control by the Chinese government," concerns it had similarly articulated in its order revoking the § 214 certificate of another Chinese carrier, China Telecom. *Revocation Order*, 37 FCC Rcd. at 1518 ¶ 61 (citing *China Telecom (Ams.) Corp.*, 36 FCC Rcd. 15966, 16002 ¶ 59 (2021) (hereinafter "*China Telecom Order*")). There, the FCC noted that "[t]he U.S. [G]overnment has found that the Chinese government exerts influence over state-owned enterprises through the [CCP]," *China Telecom Order*, 36 FCC Rcd. at 16002 ¶ 59, including by "establish[ing] its branches in companies to carry out

activities of the [CCP]," *id*. at 16000 n.235. Regarding CUA's arguments here that its U.S. incorporation made it sufficiently independent from its parent entities and the Chinese government, the FCC explained that it had previously "addressed and rejected" similar arguments "in both the [*China Mobile Order*] and the [*China Telecom Order*], finding that an entity's incorporation in the United States does not prevent that entity from being forced to comply with Chinese government requests." *Revocation Order*, 37 FCC Rcd. at 1513 ¶ 54. Based on this evidence, the FCC "agree[d] with the Executive Branch agencies' statement that the potential for [CCP] influence 'is not theoretical.'" *Id*. at 1520 ¶ 62 (footnote omitted). As a result, the Commission concluded that "CUA's assertion that it is 'an independent corporation' that is 'sufficiently separate from the [Chinese] government,' is contradicted by the record evidence." *Id*. at 1510 ¶ 52 (footnote omitted).

In holding that the FCC's determinations were reasonable, we agree with the comparable unanimous, separate decisions of the D.C. Circuit in two parallel cases. In *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022), the relevant Executive Branch agencies presented similar evidence and articulated similar national security concerns with regard to China Telecom's ultimate Chinese government ownership and its susceptibility to Chinese government influence, exploitation, and control for intelligence and espionage purposes. *See China Telecom Order*, 36 FCC Rcd. at 15998–16008 ¶¶ 52–65; *China Telecom*, 57 F.4th at 265–66. The FCC revoked China Telecom's § 214 certificate on the basis of national security concerns and, on review under the APA, the D.C. Circuit held the FCC's determination to have been reasonable and substantially supported by the record. *See China Telecom*,

57 F.4th at 265–67. The court emphasized that it could not "interfere with the agency's latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest," *id*. at 267 (quoting *United States v. FCC*, 652 F.2d 72, 96 (D.C. Cir. 1980)), particularly "when national security is implicated," *id*. (citing *Agee*, 453 U.S. at 292 ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.")). Because the record substantially supported "the Commission and the Executive Branch agencies' policy judgment regarding the national security risk posed by China Telecom," the D.C. Circuit determined that it had "no basis upon which to question the propriety of the Revocation Order." *Id*.; *see also Pacific Networks Corp. v. FCC*, 77 F.4th 1160, 1164–66 (D.C. Cir. 2023) (unanimously rejecting a similar APA challenge to the FCC's revocation of § 214 certificates based on concerns that the carriers, who were ultimately owned by the Chinese government, posed national security risks and had proved themselves untrustworthy).

Given the substantial evidence supporting the FCC's conclusions that CUA's retention of its § 214 certificates presents serious, particular national security risks, we conclude that the FCC's revocation of CUA's § 214 certificates was not arbitrary and capricious and that the factual determinations underlying its decision were supported by substantial evidence.

## B

The FCC's alternative ground for revoking CUA's certificates was that it had exhibited a lack of candor and trustworthiness with the FCC during its interactions with the agency. *See Revocation Order*, 37 FCC Rcd. at 1555–56

¶ 111.  This conclusion was also amply supported and was not arbitrary and capricious.

Honesty and transparency with government agencies are important to assessing "an authorization holder's ability to comply with the [FCC's] statutory authority and implementing rules." *Revocation Order*, 37 FCC Rcd. at 1562 ¶ 123.  Such considerations take on an additional dimension when the subject matter giving rise to the agency's concern about a company's trustworthiness involve that company's connections to a foreign power whose activities raise grave national security concerns. *See id*. at 1563 ¶ 125.  As detailed above, substantial evidence supports the FCC's determination that CUA had demonstrated a serious lack of candor and trustworthiness in its responses to the FCC's inquiries.  *See id*. at 1555–63 ¶¶ 111–23.  CUA's answers regarding its chain of ownership, its board of directors' CCP membership, its parent entities' control over its management and operations, and access to its U.S. customer records by non-U.S. parent and affiliate companies contained significant omissions and incorrect information, and they failed to fully answer the FCC's inquires.  *See id*. at 1556–61 ¶¶ 112–20.

Deeming CUA's initial responses incomplete, the FCC's *Institution Order* had reiterated the following requests, which tracked the earlier requests made in the *Order to Show Cause*: (1) "a complete and detailed description of the current ownership and control of [CUA], including a description of the equity interest and voting interest for any entity that holds a ten percent or greater direct or indirect interest in and/or controls [CUA]"; (2) "a detailed description of the management and oversight of [CUA] by [CUG] and any entity that holds a ten percent or greater direct or indirect ownership interest in and/or controls

[CUA]"; and (3) "an identification of all officers, directors, and other senior management of all entities that hold a ten percent or greater direct or indirect ownership interest in and/or control [CUA], their employment history (including prior employment with the Chinese government), and their affiliations with the [CCP] and the Chinese government." *Institution Order*, 36 FCC Rcd. at App'x A (emphasis omitted).

Nevertheless, knowing again exactly what information the FCC sought, CUA failed to clarify or even acknowledge the significant degree of management and control CUG appears to exercise over CUA's operations and U.S. customer records. Regarding the repeated inquiry about CUA's direct and indirect ownership and management, CUA offered a circumspect response, stating:

> CUG provides shared services to CUA, as well as all of its international subsidiaries, for product development, technical solutions, network monitoring and planning, order implementation, project management, and customer services. Other than CUG, no other entity that holds a ten percent or greater direct or indirect ownership interest in and/or controls CUA . . . has management and oversight of CUA's operations.

Underscoring CUA's lack of forthrightness, the confidentiality agreement governing storage of and access to U.S. customer records that CUA had initially failed to disclose provided a different, previously unmentioned entity—CUHK Operations—with access to CUA's U.S. customer records. *See Revocation Order*, 37 FCC Rcd. at

1515–16 ¶¶ 57–58. And contrary to CUA's representations, the confidentiality agreement was *not* signed between CUA and CUG, but between CUA and CUHK Operations, and did not mention CUG at all. *See id*. at 1515–16 ¶ 58, 1542 ¶ 88. CUA did not acknowledge this discrepancy, leaving the FCC with "no explanation as to [CUA's] or CUG's relation to [CUHK Operations], or how CUG can be considered a party to and legally bound by [the confidentiality] agreement." *Id*. at 1516 ¶ 58.

Most importantly, the FCC found that this revelation flatly contradicted CUA's prior representation that it "strictly limits access to the U.S. customer records solely to CUA and CUG." *Revocation Order*, 37 FCC Rcd. at 1542 ¶ 87. Further, the confidentiality agreement mentioned an additional document, the "Account and Passcode Security Policy," which CUA claimed "governs access to U.S. customer records." *Id*. at 1558 ¶ 116. While CUA informed the FCC that the policy was only available in Chinese and that CUA was working to translate and provide an English copy to the Commission, it never did so. *See id*. On this basis, the FCC determined that it could not be certain that CUA would not provide access to U.S. customer records to other entities not disclosed in the proceedings. *Id*. at 1541–42 ¶ 87. All these considerations together provide sufficient grounds to find that CUA did not exhibit candor and trustworthiness in its dealings with the FCC.

The FCC has previously considered trustworthiness an important factor in two recent decisions concerning other Chinese state-owned carriers. In denying § 214 authorization to China Mobile, the FCC explained that the company's lack of trustworthiness in its dealings with the U.S. Government—specifically, the U.S. Government's inability to trust China Mobile's representations regarding

compliance with potential mitigation measures to address national security concerns—was one of the animating reasons behind its decision.  *See China Mobile Order*, 34 FCC Rcd. at 3379 ¶ 36.  In *China Telecom*, the FCC found that revocation of China Telecom's § 214 authorizations was warranted by the fact that China Telecom had failed to provide certain required notifications regarding overseas access to and storage of U.S. records and by the fact that it had made "inaccurate, incomplete, or misleading representations to government agencies" about "the potential disruption or misrouting of U.S. communications." *China Telecom*, 57 F.4th at 267–68.  The D.C. Circuit agreed, holding that the FCC's decision was based on substantial evidence in the record.  *See id*. at 268.  Our decision in this case aligns with our sister circuit's decision.

## IV

CUA also asserts that the FCC failed to follow the requisite procedures prior to revoking CUA's § 214 certificates.  *See* 5 U.S.C. § 706(2)(D).  Consistent with the decisions of the D.C. Circuit in *China Telecom* and *Pacific Networks*, we reject these contentions.

The Communications Act gives the FCC authority to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice," 47 U.S.C. § 154(j), and also gives the agency broad discretion to craft its own rules "of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties," *FCC v. Schreiber*, 381 U.S. 279, 290 (1965); *see also China Telecom*, 57 F.4th at 268–69. The FCC has generally chosen to exercise this discretion to "resolve disputes of fact in an informal hearing proceeding on a written record."  *China Telecom*, 57 F.4th at 268–69

(quoting *Procedural Streamlining of Admin. Hearings*, 35 FCC Rcd. 10729, 10732 ¶ 11 (2020)).  Here, as in *China Telecom*, the FCC "reasonably determined that the issues raised in this case could be properly resolved through the presentation and exchange of full written submissions before the [FCC] itself."  *Id*. at 269.

CUA argues that, under 47 C.F.R. § 1.91(b) and (d), the FCC was required to conduct a hearing under the FCC's "subpart B" rules, which mandate an evidentiary hearing before an ALJ prior to the issuance of a revocation order. *See also* 47 C.F.R. §§ 1.201–.377.[14]  But as the D.C. Circuit noted, these rules "implement Title III of the Communications Act and pertain to proceedings regarding station licenses and construction permits, which are not at issue here."  *China Telecom*, 57 F.4th at 269.  Although the FCC has occasionally "borrowed these procedures" in the context of a revocation of a § 214 certificate, this "past practice" is insufficiently consistent to support the conclusion that the FCC "erred in law or judgment" in declining to borrow those procedures here.  *Id*.

We also reject CUA's argument that, in violation of the APA's provisions concerning license revocation, CUA was deprived of the "opportunity to demonstrate or achieve compliance with all lawful requirements."   5 U.S.C. § 558(c)(2).  Considering the multiple opportunities that CUA had, over the course of its interactions with the FCC, to explain its position concerning the points of concern raised by the agency, and the lack of cooperation and forthrightness reflected in CUA's overall course of conduct,

---

[14] The FCC argues that CUA failed to raise this argument during the agency proceedings and therefore waived it, but CUA did raise this argument in its response to the *Institution Order*.

we conclude that CUA did not need to be afforded yet another opportunity to try to unring the bell of its ongoing lack of trustworthiness, particularly with respect to issues that involve serious national security concerns.  *See China Telecom*, 57 F.4th at 269; *see also Pacific Networks*, 77 F.4th at 1165.

## V

For the foregoing reasons, we deny CUA's petition for review.

**PETITION DENIED.**

BEA, Circuit Judge, dissenting:

"The Lord giveth and the Lord taketh away. Blessed be the Lord." *See Job* 1:21 (King James). Today, the majority declares that the Federal Communications Commission ("FCC") may act as the Lord in cancelling telecommunications certificates. In its view, the FCC's statutory power to grant § 214 certificates under the Communications Act of 1934 (the "Act") necessarily implies the power to revoke such certificates of, and solely upon its own volition. I disagree. Unlike the majority, I find myself constrained by the text of the statute and a regard to separation of powers principles of our Constitution to resolve this case otherwise.

Congress has stated the particular powers that the FCC possesses under the Act. Revocation authority of previously issued telecommunications certificates upon the sole initiative and action of the Commission, but without judicial proceedings and authorization, is not one of them. No proper statutory construction can make that so. That reason should dispose of the matter before us. The FCC's attempted revocation of the validly granted § 214 certificates authorizing China Unicom (Americas) Operations, Ltd. ("CUA") to provide domestic and international telecommunications services was *ultra vires*—without lawful authority. CUA is entitled to have these certificates reinstated. Thus, I would grant CUA's petition for review, vacate the FCC's order, and remand with instructions for the FCC to reinstate CUA's § 214 certificates.

Because the majority instead denies CUA's petition, I respectfully dissent.

## I.  THE TEXT

The touchstone of all questions of statutory interpretation is the text of the particular statute at issue. *Van Buren v. United States*, 593 U.S. 374, 381 (2021).

### A.  The Communications Act and 47 U.S.C. § 214

While perhaps not a paragon of good drafting, a detailed review of § 214 reveals the full extent of the authorities Congress granted to the FCC with respect to § 214 certificates.  Section 214(a) provides as follows[1]:

> [T]he construction of a new line or [] an extension of any line[2] . . . [requires the carrier to] obtain[] from the Commission a certificate that the present or future public convenience and necessity require or will require the [new line or its extension]:
>
> . . .
>
> [But lines that are wholly intrastate or otherwise excepted by the Act do not need certificates.]
>
> . . .

---

[1]  I have made some edits to improve the reader's ability to analyze the relevant provisions at issue in this case.  The text of the provision is reformatted to separate relevant clauses.  I have also provided summaries of excerpted clauses that are not relevant to the statutory interpretation question before the panel.

[2]  "As used in this section the term 'line' means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels. . ."  47 U.S.C. § 214(a).  No parties dispute that CUA's use of the "lines" falls within the statutory meaning.

[The FCC, upon request, has temporary emergency power to authorize new lines without issuing a certificate if the proposed lines are necessitated by the emergency.]

. . .

[A carrier's] discontinu[ance], reduc[tion], or impair[ment of] service . . . [requires it to obtain the prior approval of] the Commission [via] a certificate that [affirms that] neither the present nor future public convenience and necessity will be adversely affected[—again, subject to an exception that a carrier can request the FCC to authorize the cessation of services without issuing a certificate if an emergency situation necessitates such cessation.]

. . .

[This provision applies to all communication lines except for those lines which have the sole purpose of connecting already existing, approved telecommunications lines. Telecommunications companies do not need pre-approval to perform regular maintenance to ensure that their existing lines are properly functioning.]

47 U.S.C. § 214(a). The statute makes clear that a telecommunications carrier's ability to begin or to end its provision of telecommunications services requires the FCC's prior approval. It establishes that the FCC's authority to act in issuing a certificate to start or to end service is granted only upon a telecommunications company's request

or filing of an application with the agency. There is no general provision authorizing the FCC to act of its own accord (*sua sponte*) to grant or to revoke a certificate for a company to operate a telecommunications line, absent that company's request or application for such a certificate.

Indeed, revocation of permission to commence, to change, or to abandon service *sua sponte* on the Commission's initiative is not mentioned once in subsection (a) of § 214—only application for such actions by applicants and certificate holders is mentioned. The standard canon of construction that courts apply to a statute's provision of powers is *expressio unius est exclusio alterius*. *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312–13 (9th Cir. 1992). Namely, the specificity of § 214's provision of authority to the FCC to grant a certificate to start, to modify, to change, or to end services only upon a telecommunications carrier's application would normally imply Congress intended not to grant the FCC the authority to take a different course of action with respect to such certificates such as the present *sua sponte* action of the Commission. *See id.* at 1313 (dismissing a petition for review for a want of subject matter jurisdiction after applying *expressio unius* to a statute governing the EPA's ability to set water quality standards for specific pollutants because the rule the petitioners challenged was issued pursuant to a section of the Clean Water Act not *specifically* listed in the provision providing for judicial review). Here, the majority permits the FCC to act according to authority that is not expressly authorized in the Act. The majority holds that the FCC properly revoked CUA's certificates, even though the Act permits the FCC to authorize CUA's cessation of its telecommunications operations *only* when a certificate holder, such as CUA, applies for such a

cessation.[3]  47 U.S.C. § 214(a).  Under the *expressio unius* canon, the Act's failure to grant the FCC the revocation

---

[3]  Section 214 makes clear that the FCC's only authority to initiate proceedings of its own accord relating to the provision of telecommunications services pursuant to a § 214 certificate is limited to scenarios where a telecommunications carrier is purportedly slacking in its provision of telecommunications services—a subsection not applicable to CUA's case because it was not the basis for the FCC's actions.  *See* 47 U.S.C. § 214(d).

But even in those subsection (d) proceedings, the FCC is not given *any* revocation authority.  Rather Congress authorized the FCC to take three specific actions to incentivize a derelict company: the FCC can either "require by order any carrier, party to such proceeding, [(1)] to provide itself with adequate facilities for the expeditious and efficient performance of its service as a common carrier[,] [(2)] to extend its line or [(3)] to establish a public office."  *Id.*  Thus, the FCC is given the authority to assess deficient performance *sua sponte*.  But to remedy any such deficiency, the FCC is limited to *ordering* the carrier to fortify and to upgrade its services.  This express listing of ways the FCC can mandate compliance with the demand for exceptional service does not permit us to imply that the FCC also has the authority to revoke the wastrel company's license.

This textual analysis is bolstered by the fact that in subsection (d) proceedings, the only penalty that a noncompliant carrier can be assessed is a fine of "$1,200 for each day . . . such refusal or neglect continues." 47 U.S.C. § 214(d).  The FCC could likely also sue to enjoin the carrier's continued provision of inadequate service, which would constitute a "reduction[] or impairment of service contrary to" the duly authorized subsection (d) order.  *See infra* note 4 (discussing 47 U.S.C. § 214(c)). Notice, however, that an action to so enjoin would take place in a U.S. district court subject to the normal rules of litigation, and the case would be decided by an Article III judge.  This scenario is not quite the same as a Commission proceeding.  But even in this, subsection (d), the only subsection of § 214 that grants the FCC the authority to act *sua sponte*, the terms 'revocation' and 'cancellation' are noticeably absent.  As the Supreme Court recently reaffirmed, under the *expressio unius* canon of

authority it demands means the FCC was not permitted to revoke CUA's certificates below.

I would end my analysis there if I could.  The statute plainly forecloses the FCC's revocation of CUA's § 214 certificates because no such power is expressly listed.  But because the majority does not adhere to the plain text of the Act, I must explain why the majority's arguments to the contrary fail to persuade.  As explained below, subsection (a) of § 214 is not the only textual clue in § 214 supporting the statutory interpretation which leads to the conclusion that the FCC here lacks revocation authority, where revocation is initiated solely by the FCC and adjudicated solely in the FCC.

Continue to subsection (b).  Although the FCC must consult with the Department of Defense and the Department of State regarding national security concerns, *see* Maj. Op. 42-43, this obligation is triggered only upon the FCC's "receipt of an application for a[] [] certificate" from a telecommunications company that seeks authorization to initiate a new line or to terminate an existing one.  47 U.S.C. § 214(b).  Thus, rather than permitting the FCC to engage in a freewheeling analysis prompted by its own, unilateral, unchallenged, and unexplained notions of changes to the national security landscape, the FCC's § 214 authority to review national security concerns with other executive

---

statutory construction, the express listing of the actions the FCC can take strongly implies that the FCC is not authorized to take actions that are not listed.  *Bittner v. United States*, 598 U.S. 85, 94 (2023).  Were the FCC authorized *sua sponte* to revoke a duly granted certificate, such as those CUA holds, as the majority concludes it can, I would expect to find such an express grant of authority in the text of § 214 given the Act's level of detail in specifying what powers the FCC has.  The majority has not identified any such textual basis for the power it gives the FCC today.

agencies is limited to scenarios where *a carrier requests* authorization to modify its existing telecommunications services or to provide new services.  Petitioner has not requested any such modification of its services, so subsection (b) is of no aid to the Commission.

Subsection (c) expresses—in no uncertain terms—that the FCC's authority over these certificates is limited only to its power "to issue . . . or to refuse to issue" such certificates "*as applied for*" by a candidate telecommunications carrier. *Id.* § 214(c) (emphasis added).[4]   These provisions make

---

[4]  At oral argument, the FCC's counsel conceded that its claim of *sua sponte* revocation authority could not be found in the final clause of § 214(c), which clause authorizes the FCC to file a lawsuit to "enjoin[]" any unauthorized telecommunications services.  As counsel correctly explained, the FCC does not here seek to exercise revocation authority because CUA's operations are unauthorized.  Rather, the FCC sought to revoke CUA's licenses *because* CUA's provision of telecommunications services is authorized and can continue unless and until its certificates are revoked.

Although this authority in the final clause of section 214(c) does not permit the FCC to terminate CUA's operations solely through agency action commenced by the agency *sua sponte*, the ability to enjoin unauthorized service would likely be a tool the FCC could use to enforce valid conditions attached to § 214 certificates.  *See* 47 U.S.C. § 214(c). Namely, if a telecommunications carrier continues to provide services without complying with valid conditions in its certificate related to the security of its telecommunications network, the carrier's services would no longer be authorized by the terms of its certificate.  Thus, the FCC could likely bring a suit to enjoin that carrier's unauthorized operations. Similarly, if a carrier committed fraud on the FCC in its initial application for a § 214 certificate, the FCC would likely be able to enjoin that carrier's operations given the certificate issued was not valid in the

clear that the FCC's claimed authority to 'cancel' or to 'revoke' § 214 certificates of its own accord is nowhere to be found in the text of § 214. *Expressio unius* is again applicable here because the FCC is permitted to act pursuant to § 214(c) to issue or to refuse to issue a certificate authorizing initiation or cessation of services *upon application by a company*—full stop. It stretches the English language to suggest that the failure of Congress to prohibit the FCC from taking other actions is tacit permission from Congress for the FCC to act beyond that authority granted to it. Congress wields the constitutional power to shape an agency's authority—agencies have no power save that which they are granted by their constituent statutes. *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) ("[T]he FCC's power to [take certain actions] . . . is limited to the scope of the authority Congress has delegated to it."). In reviewing FCC actions, courts must hew to that statutory grant of authority and proceed no further. *Id.* Thus, the majority oversteps when it holds that the FCC has *sua sponte* certificate revocation authority solely initiated by agency action when the Act expressly provides for no such thing. Where does the majority find a basis for such revocation

---

first instance account the fraud. Notice again, such suits would not lie in the Commission's offices but in U.S. District Courts.

But, of course, none of this is applicable to CUA. The FCC has not charged CUA with violating any conditions on its certificates, and the FCC has not sued to enjoin CUA's services. The only "condition" the FCC cites in this case to justify the agency proceedings below is its own reservation of revocation power. But as explained below, *see infra* Section I.B.i, this reservation of revocation authority constitutes a valid condition only if the Act grants the FCC power to exercise revocation authority, absent an application and on its own initiative, in the first instance. Because the Act does not give the FCC that power, this "condition" does not permit the FCC to take the actions that it did below.

authority?  Not in the statute itself, but as we shall see, in some *extra-statutory* notion.

The majority avoids this plain meaning of the text of the statute by contending that there is no material difference between the refusal to grant a certificate and the revocation of such a certificate.  Maj. Op. 32.  Put another way, the majority believes that the FCC's power to refuse to grant a certificate in the first instance implies that it also has the power to initiate revocation of the certificate after issuance. *Id.*  For the majority, it is as simple as that.

Let us start with the premise that the power to refuse certification is the functional equivalent of the power to revoke certification.  That position is untenable because it ignores the reliance interests carriers may develop in their § 214 certificates.

A business that is refused a certificate can decide to expend no further capital—money—for its proposed enterprise.  But a business that has been granted a certificate is likely to have invested further capital, time, and resources into existing infrastructure in reasonable reliance on the vested right to build a telecommunications line pursuant to its duly granted § 214 certificate.[5]  Simply put, there is a material difference between the power to refuse and the power to revoke.  It is not reasonable to assume that the power to grant, to refuse, or to condition a grant also encapsulates the power to revoke.  *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (en banc) (refusing *Chevron*

---

[5]  Although the question is not before us, it is not surprising that CUA had raised a takings claim before the agency given the FCC's revocation of CUA's § 214 certificates was bound to interfere with CUA's "investment-backed expectations."  *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

deference and rejecting the Attorney General's contention "that the power to denaturalize is 'inherent' in the power to naturalize" citizens by explaining that "[t]here is no general principle that what one can do, one can undo" and by identifying obvious examples of the difference between the power to grant and the power to revoke: "A person can give a gift, but cannot take it back.  A minister, priest, or rabbi can marry people, but cannot grant divorces and annulments for civil purposes.  A jury can acquit, but cannot revoke its acquittal and convict.").  For this reason, the majority's argument that the general power to grant is the functional equivalent of the general power to revoke does not support its holding.

To escape this textual conclusion that the power to deny does not equal the power to revoke, the majority cites *Haig v. Agee*, 453 U.S. 280 (1981), a Passport Act case concerning the State Department's revocation authority of passports. Maj. Op. 30-32.  But the majority's reliance on *Agee* is misplaced.  Agee was a former CIA operative who engaged in various overseas activities that sought to threaten national security, specifically, "expos[ing] CIA officers and agents." *Agee*, 453 U.S. at 283.  The Secretary of State revoked his passport because Agee's "activities abroad [were] causing or [were] likely to cause serious damage to the national security or the foreign policy of the United States." *Id.* at 286.  Agee sued the Secretary of State demanding he return Agee's passport.  *Id.* at 287.  The district court ordered Agee's passport returned, and the D.C. Circuit affirmed, holding there was "no express statutory authorization for the revocation." *Id.* at 288.  The Supreme Court reversed, but with reasoning that has no application to this case.

The Supreme Court noted that the "Passport Act does not in so many words confer upon the Secretary a power to

revoke a passport. Nor, for that matter, does it expressly authorize denials of passport applications." *Id.* at 290. The relevant language, unchanged since 1926, provided:

> "The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic representatives of the United States . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

22 U.S.C. § 211a (1981). Reading this provision in line with the entire Passport Act, the Court observed that the Passport Act did not "expressly limit those powers," nor did it "expressly authorize denials of passport applications." *Agee*, 453 U.S. at 290. Because the Supreme Court had already "recognized congressional acquiescence in Executive policies of refusing passports to applicants," *see Kent v. Dulles*, 357 U.S. 116, 127 (1958), the Court recognized that the Secretary of State had some form of revocation authority. *Agee*, 453 U.S. at 291-306. The Court then surveyed the State Department's past administrative practices and policies. On national security grounds, the Court found there was a "sufficiently substantial and consistent [practice] to compel the conclusion that Congress approved" of the State Department's power to revoke passports, even though the State Department rarely exercised this power. *Id.* at 301-03, 306 (quoting *Zemel v. Rusk*, 381 U.S. 1, 12 (1965)).

On this reasoning, the majority writes that "*Agee* further confirms what common sense already suggests, which is that a statutory grant of agency authority to 'issue' an authorizing document may carry with it an implied ancillary grant of authority to 'deny' and to 'revoke' such documents." Maj. Op. 32. But a closer look at the Passport Act reveals that the majority's common sense reasoning may not be so common as to apply in all cases. The Communications Act—the statute this Court is tasked with interpreting—has few *textual* similarities to the Passport Act at issue in *Agee* and some important dissimilarities.

The *Agee* Court relied heavily on the fact that the Passport Act did not expressly limit the "denial of [a] passport application," nor did it "limit" the power to revoke a passport. *Agee*, 453 U.S. at 290. The Communications Act of 1934, unlike the Passport Act, specifically provides the FCC the "power to refuse [a certificate]." 47 U.S.C. § 214(c). And the Communications Act, unlike the Passport Act, contains other statutory provisions wherein Congress expressly provides the FCC with the power to revoke a license. 47 U.S.C. §§ 307, 312. Simply put, the statutory schemes between the two Acts differ significantly. While it may be true that Congress did not expressly limit the FCC's power to revoke a § 214 certificate, Congress clearly understood it could and did authorize the FCC to have such a revocation power in certain circumstances. Section 312 expressly authorized the FCC to revoke a radio station license according to specific procedures. 47 U.S.C. § 312(a). But section 214, a provision enacted at the same time in the same Act, has no such express authorization. *See* Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064, 1075-76, 1087 (1934). Accordingly, *Agee* cannot support the atextual conclusion

that Congress invested the FCC with implied authority to
revoke a § 214 certificate *sua sponte* and solely by agency
action, no matter how much the majority thinks the common
sense surmised in Agee's Passport Act case should be
transferable to CUA's Communications Act case.[6]

---

[6] The majority, perhaps realizing that *Agee* cannot independently support
its reading of § 214, also cites *Myers v. United States*, 272 U.S. 52, 164
(1926), for the proposition that "the grant of authority to issue a
certificate must be understood as carrying with it an implied incidental
authority to revoke [a certificate]." Maj. Op. 28-29. But this citation is
inapt, and *Myers* cannot support the majority's atextual conclusion here.

*Myers* is a case cut from wholly different cloth. There, the Supreme
Court resolved whether the President had the power to remove an
Executive Officer as incident to his power of appointment under Article
II, Section 2, Clause 2 of the Constitution. 272 U.S. at 164. In so doing,
the Supreme Court relied on history and separation of powers principles
from the famous Decision of 1789, a series of statutes embodying the
position that "all top executive officials . . . would serve at the
[P]resident's pleasure per the Constitution itself," *see Akhil Reed Amar,
The Words That Made Us: America's Constitutional Conversation,
1760-1840*, at 358-60, (2021), when holding that the President had the
incidental and *inherent* power bestowed by Article II of the Constitution
to remove an Executive Officer. *Myers*, 272 U.S. at 145-46, 163-64. In
the case before us today, we do not deal with the inherent powers
bestowed by the Constitution to an administrative agency such as the
FCC for the simple reason that there are none. An administrative agency
simply has no inherent power. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S.
355, 374 (1986) ("[A]n agency literally has no power to act . . . unless
and until Congress confers power upon it."). The FCC, unlike the
President, is a creature of statute, not the Constitution. *Id.* Thus, the
FCC can exercise *only* the delegated powers that Congress has granted
it. *Id.*; *see Am. Library Ass'n*, 406 F.3d at 698 ("The Commission 'has
no constitutional or common law existence or authority, but only those
authorities conferred upon it by Congress.'" (citing *Michigan v. EPA*,
268 F.3d 1075, 1081 (D.C. Cir. 2001)). Accordingly, the holding in

In a footnote, the majority next cites the FCC's power to condition the issuance of certificates as textual support for its holding that the Act grants the FCC its claimed revocation power.  Maj. Op. 43 n.13.  But again, the power to condition a certificate does not support the construction the majority wishes to give the Act.  Even when an agency can limit the scope of a telecommunications company's operations through the imposition of conditions, the company may still operate a telecommunications line in some condition. A flat-out revocation would still interfere with the (albeit more limited) vested rights and reliance interests of a company that was granted a certificate that contains conditions.

Additionally, the Communication Act's provisions other than § 214 treat the power to condition a certificate as materially different from the power to revoke a certificate. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning.  A legal instrument[, like a statute,] typically contains many interrelated parts that make up the whole.  The entirety of the [statute] thus provides the context for each of its parts.").  This is clear from a comparison of § 214 and other provisions of the Act relating to the FCC's issuance of radio broadcast licenses.  47 U.S.C. §§ 307, 312.  Although radio stations are subject to a different licensing regime than are telecommunications lines, both statutory grants of licensing authority were

---

*Myers*, a separation of powers case based on its Founding Era pedigree reading of the Constitution and limited to the question whether any President, under the Decision of 1789, could fire Officers he has appointed, should not be imported to this case for the general proposition that a power to grant necessarily implies a power to revoke, no more than could the Biblical phrase with which the Dissent commences imply such power.

passed in the same act, *see* Pub. L. No. 73-416, 48 Stat. 1064, 1075-76, 1087 (1934), and we must read the two statutory provisions in concert.[7]  As with companies seeking § 214 certificates, commercial entities operating radio stations must apply for a broadcast license, which application the FCC may grant or refuse "if public convenience, interest, or necessity will be served thereby."  47 U.S.C. § 307(a).  The FCC is authorized to place terms and conditions on such licenses governing how the recipient operates its radio station.  *Id.* § 301.

But unlike the lack of the FCC's authority to revoke telecommunications § 214 certificates, the FCC is specifically authorized to revoke radio licenses according to specified procedures outlined in the Act.  *Id.* § 312(a).  As has long been recognized as a rule of statutory construction, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and

---

[7] The majority suggests that we cannot read Title II and Title III *in pari materia* because the nature of a telecommunications certificate is different than a radio license given that broadcast licenses are issued for fixed, renewable terms, whereas telecommunications certificates are not. Maj. Op. 37-38.  But that would discount well-established rules of statutory construction.  "We do not, however, limit this inquiry to the text of [one statutory section] in isolation.  Interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.  We thus look to the provisions of the whole law to determine [the statute]'s meaning."  *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414-16 (2017) (citations, internal quotation marks, and alterations omitted) (interpreting one section of the Copyright Act, 17 U.S.C. § 101, in light of "[t]he statute as a whole"—that is to say, with reference to other sections of the Copyright Act, 17 U.S.C. §§ 106, 113).

purposely in the disparate inclusion or exclusion."**8** *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotations omitted) (rejecting the defendant's argument that the "interest" he had to forfeit to the government for violating the Racketeer Influenced and Corrupt Organizations Act was limited to his ownership interest in the racketeering enterprise because Congress had made that exact limitation express in another subsection of the same act by modifying the word "interest" with the clause "in . . . any enterprise" but had omitted such limiting language in the subsection applicable to the defendant).  Here, the obvious implication of the Act's grant of revocation authority to the FCC in one

---

8 This rule is well-established in our statutory interpretation caselaw: the Supreme Court applied it in three different cases during the 2023 term. *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 348–49 (2023) (holding that Congress's decision in the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 expressly to abrogate the sovereign immunity of Puerto Rico and its governmental units in debt-restructuring proceedings but "not to adopt similar language to govern other kinds of litigation" necessarily implied that Congress did not abrogate any sovereign immunity Puerto Rico or its governmental units enjoyed from other legal claims); *Bittner v. United States*, 598 U.S. 85, 94 (2023) (holding that when Congress expressly attached penalties to a defendant's failure to report foreign bank accounts on a per-account basis for willful violations of his reporting obligations, the failure to use per-account language to describe the penalties for non-willful violations meant that Congress intended not to penalize non-willful violations on a per-account basis); *Bartenwerfer v. Buckley*, 598 U.S. 69, 77–78 (2023) (holding that Congress's decision to use the word "debtor" in bankruptcy provisions that bar the discharge of debts arising from false statements published by the debtor himself implied that Congress's use of the passive voice in a provision precluding the discharge of debts obtained by fraud implied Congress also intended the obtained-by-fraud provision to bar the discharge of debts arising from fraud for which the debtor is liable, even were he not the fraudster).

licensing regime (radio) but not in another (telecommunications) supports this reading of the statute. Had Congress given the FCC revocation authority over § 214 certificates, such as CUA's here, it would have expressly detailed the procedures for such revocations just as it did for the FCC's revocation authority over radio station licenses.[9]

These statutory clues treat revocation as a distinct grant of power that is not akin to the FCC's power to refuse or to

---

[9] The majority's primary reason for rejecting the differences between § 214 and the provisions governing radio station licenses as textual support for the holding that the FCC cannot revoke CUA's certificates fails to persuade. The majority contends that Congress needed to detail how to revoke radio station licenses because they expire after a set time period. Maj. Op. 38. In contrast, so says the majority, Congress did not need to specify how the FCC could revoke § 214 certificates for the revocation power to exist because § 214 certificates can last indefinitely. *Id*.

But the majority's reasoning actually supports quite a contrary inference. The time-limited licensing regime for radio stations has its own natural expiration date. Why would Congress need to detail specific mechanisms for revocation of the licenses if the FCC could just wait out the deadline? Presidents do this all the time with pocket vetoes—they wait for Congress to wrap up its most recent session without deciding whether or not to sign a law they are disinclined to give the force of law. *See The Pocket Veto Case*, 279 U.S. 655 (1929). If there ever were a need to detail the procedures for revocation, it would be to explain how the FCC can revoke the *indefinite* § 214 certificates—not the time-limited radio station licenses, which are naturally revoked after the statutory expiration date passes. Indeed, though it is perhaps axiomatic that "the greater includes the lesser," the contrary would make no sense at all. As Congress has declined to enact the procedures for *sua sponte* FCC revocation of the § 214 certificates, such as those possessed by CUA, we must leave it at that: the FCC presently has none.

condition the grant of a certificate.  The majority's attempts to discount these contextual clues are unpersuasive.

As stated at the commencement of this dissent, while the Anglicans intone that "The Lord giveth and the Lord taketh away," the FCC is not the Lord, even of telecommunications certificates.  Nor, like the Lord, is the FCC the fount of its own power.  Congress is.  *La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it. . . . [W]e simply cannot accept an argument that the FCC may nevertheless take action which it thinks will best effectuate a federal policy.  An agency may not confer power upon itself.").  By its silence, Congress has expressly told us that no *sua sponte* revocation authority is granted to the FCC.  This lack of a textual foundation for the FCC's claimed power to revoke § 214 certificates should end the inquiry.[10]

---

[10]  Possibly because it realized its textual analysis lacked merit, the FCC also argued that its revocation authority stemmed from the Act's so-called necessary and proper clause.  47 U.S.C. § 154(i) (grants the FCC ancillary authority to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions").  The FCC has had little success with this argument in the past.  Courts have consistently rejected its prior attempts to validate this purported theory of administrative law.  Section 154(i) is "not an independent source of regulatory authority; rather, it confers on the FCC only such power *as is ancillary to the Commissions specific statutory responsibilities*." *California v. FCC*, 905 F.2d 1217, 1240 n.35 (9th Cir. 1990) (emphasis added); *accord Comcast Corp. v. FCC*, 600 F.3d 642, 653 (D.C. Cir. 2010) ("The [FCC]'s ancillary authority is really incidental to, and contingent upon, *specifically delegated powers under the Act*." (cleaned up) (emphasis added)).  For this reason, I agree with the majority insofar as it declines to adopt the FCC's reasoning on this point.  But the

## B.  The FCC's Blanket Orders and Past Practice

The majority, perhaps realizing that its textual analysis could not support revocation authority, places in a footnote that the FCC's "blanket" orders asserting its revocation authority support the existence of a *sua sponte* revocation power of § 214 certificates.  Maj. Op. 43 n.13.[11]  Yet, this cannot support the majority's position.

### i.  Blanket Orders

Start with the FCC's blanket orders.  This creative (but ultimately flawed) argument proceeds as follows:  Because CUA's § 214 certificates were issued *after* the FCC promulgated two "blanket" orders that govern the issuance of domestic and international § 214 certificates, *Implementation of Section 402(b)(2)(A) of the*

---

majority's reliance on § 154(i) to bolster the rest of its analysis is unpersuasive.  Because § 154(i) is not an independent source of power, it can support the majority's analysis only if one were to agree with the majority that § 214 grants the FCC *sua sponte* revocation authority.  As I have attempted to demonstrate, the plain text of § 214 lacks such grant.  Thus, that the FCC has ancillary powers under § 154(i) says nothing about whether the majority is correct that § 214 contains revocation authority.  As a result, the majority's citation to the provision fails to support its atextual holding.

[11]   The majority correctly declines to afford the FCC *Chevron*-like deference in name.  Maj. Op. 27.  But what omnipotence other than *Chevron*-like deference can bottom the majority's conclusion? Consider *Chevron* deference to an agency interpretation of a comparable act when that act created an ambiguity "or a gap."  *See generally Garfias-Rodriguez v. Holder*, 702 F.3d 504, 515-16 (9th Cir. 2012) (en banc) (interpreting statutory gaps in the Immigration and Nationality Act).  Here, the "gap" is the lack of statutory language which provides for agency revocation of a certificate where no application therefore has been made.  Let us not give succor to *Chevron* resurrectionists.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

*Telecommunications Act of 1996*, 14 FCC Rcd 11364, 11365–66, ¶ 2 (1999); *Rules & Policies on Foreign Participation in the U.S. Telecomms. Mkt.*, 12 FCC Rcd 23891, 23893, 23897–98 ¶¶ 2, 13 (1997), CUA's certificates are bound by those blanket orders.  And because those blanket orders purported to reserve for the FCC the authority to initiate revocation and to revoke any future certificate that it authorized, CUA's § 214 certificates are therefore subject to the FCC's power to revoke the certificates for any reason the FCC deems proper.  Namely, the majority seems to agree with the FCC that because CUA accepted its § 214 certificates with notice of the FCC's blanket orders, CUA should be bound to those orders just as a train passenger is bound to the terms written on the back of his ticket.

But not so fast; step back.  Relying on the orders' reservation of revocation authority simply puts the question whether such reservation was valid in the first place.  As the FCC is not a legislative body, it cannot reserve for itself power it has not been granted by Congress, the legislative body.  Thus, its attempt to reserve the power to revoke § 214 certificates at its pleasure is without legal force.[12]   The

---

[12]  In constitutional law, this is called the doctrine of unconstitutional conditions.  As we previously explained, the doctrine

> limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary.  Government is a monopoly provider of countless services, notably law enforcement, and we live in an age when government influence and control are pervasive in many aspects of our daily lives.  Giving the government free rein to grant conditional benefits creates the risk that the government will abuse its power by attaching strings strategically, striking lopsided deals and

FCC's argument is a bootstrap argument, plain and simple: it is a claim that an actor can give himself a power by his own action.

I do not write on a blank state when I object to the majority's reliance on this argument. To begin with, an agency's attempt to arrogate to itself blanket authority to do what Congress has not authorized is a ploy to exercise legislative authority that courts have routinely rejected. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) (holding that the President lacked the authority to enforce a seizure order to prevent a labor dispute based on the President's own assertion of his power to implement a policy that was not expressly authorized by Congress). While the majority approves of the FCC's search for another way to implement its policy goals when Congress has closed the front door, the age-old legal maxim admonishes that "what cannot be done directly cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866); *accord Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230-31 (2023).

Even were we to view the FCC's arrogation of "blanket" revocation authority to itself as a *condition* that the FCC,

---

> gradually eroding constitutional protections. Where a constitutional right "functions to preserve spheres of autonomy . . . [u]nconstitutional conditions doctrine protects that [sphere] by preventing governmental end-runs around the barriers to direct commands."

*United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (quoting Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1492 (1989)) (applying the doctrine to a Fourth Amendment claim); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604–05 (2013) (takings claim); *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (collecting free speech cases).

pursuant to § 214(c), attached to the certificates CUA received, the Supreme Court rejected the same argument when it was raised by the Civil Aeronautics Board.  *Civil Aeronautics Bd. v. Delta Air Lines, Inc.* (*CAB v. Delta*), 367 U.S. 316 (1961).  In *CAB v. Delta*, the Civil Aeronautics Board argued that its reevaluation of a duly issued certificate authorizing Delta to offer air service along specified routes was permissible because it had reserved for itself the power to reconsider the certificate in the terms of the certificate itself.  *Id.* at 317–20.  Given the Board's constituent statute did not authorize its actions, the Supreme Court posited, "should it make any difference that the Board has purported to reserve jurisdiction prior to certification to make summary modifications pursuant to petitions for reconsideration?"  *Id.* at 321.  The Court's resounding conclusion was that "th[is] question[] must be answered in the negative."  *Id.*  That is to say, the Court held in no uncertain terms that an agency that lacks a statutory grant of revocation authority cannot construct such authority *impliedly* by requiring an applicant to agree to conditions it imposes to issuance of certificates— even when the conditions purport to empower the agency to revoke the certificates.  *Id.* at 328–29.  The same rule applies here: the FCC's attempt to reserve revocation authority it does not have by its assertion of that authority through a blanket order is an impermissible attempt to create an end run around the statute's failure to accord the FCC such power.

In contravention of *CAB v. Delta*, the FCC again pulls itself up by its bootstraps—an impossibility save for the majority's assistance—to create revocation authority based

solely on its own assertion of that power.[13]  Contrary to the majority, I would apply *CAB v. Delta* and hold that the FCC cannot do what the Act does not authorize.  These 'conditions' are invalid because there is no statutory basis for the FCC's claimed authority to revoke CUA's § 214 certificates in the first instance.

### ii.  Past Revocations

The FCC then argues that the FCC's past orders revoking § 214 certificates define the scope of the FCC's authority. As the Supreme Court has explained, "[p]ast practice does not, by itself, create power." *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).  Past agency practice may be relevant evidence that suggests (but does not compel the conclusion) that Congress has acceded to the agency's interpretation of its own authority.  But caselaw demands that Congress have actively legislated in the area with full awareness of the agency's behavior before a court will rely on its inaction to support an *already reasonable* interpretation of an agency's enabling statute.  *Bob Jones Univ. v. United States*, 461 U.S. 574, 599–602 (1983) (explaining that "[n]on-action by Congress is not often a useful guide" but holding that the numerous congressional debates over whether to grant tax exempt status to racially discriminatory private schools combined with the fact that Congress failed to pass over a dozen bills aimed at overturning the Internal Revenue Service's determination that such schools cannot be given

---

[13]  Forgive a repeated reference to divinity.  But the only entity of which I am aware that can generate something out of nothing on its own authority is the Creator.  *See Genesis* 1:1–31.  Yet, the majority's atextual holding allows the FCC to determine its own authority in manner that is reserved solely for the divine: the FCC would now be empowered to create its own authority from nothing by simply asserting that it possesses such authority in a blanket order.

tax exempt status under the tax code implied that Congress's "non-action" had ratified the agency's reasonable interpretation of its own authority).

Section 214 was last amended in 1997 to expand the definition of common carriers.[14]  Pub. L. No. 105–125, 111 Stat. 2540 (1997).  This was approximately half a year *before* the FCC first exercised its self-proclaimed authority to revoke a company's § 214 certificates.[15]  *CCN, Inc. et al.*, 13 FCC Rcd 13599, 13607 (1998).  The FCC's actions *after* Congress last amended the Act do not constitute evidence that Congress had knowledge of, let alone ratified, the agency's practice.  *See Sackett v. EPA*, 598 U.S. 651, 682-83 (2023) (holding that Congress's use of the term "waters of the United States" in the Clean Water Act was not a ratification of the definition promulgated by the Army Corps of Engineers because the Corps published its definition

---

[14] The FCC promulgated its blanket order that purported to reserve for itself revocation authority over all international § 214 certificates—authority it was not given by statute—in late 1997, *Rules & Policies on Foreign Participation in the U.S. Telecomms. Mkt.*, 12 FCC Rcd 23891, 23893, 23897–98 ¶¶ 2, 13 (1997).  But, this blanket order was published a week *after* the last bill amending § 214 was presented by Congress to the President for his signature.  *See Actions – S.1354*, https://www.congress.gov/bill/105th-congress/senate-bill/1354/actions (last visited Dec. 12, 2024).  Congress could not have been aware of the FCC's attempt to claim that it possessed revocation authority before the FCC publicly asserted it.

[15]  FCC's counsel conceded at oral argument that he was aware of no earlier attempt by the FCC to revoke a § 214 certificate.  Oral Arg. 30:30–31:02.  This is not surprising given the Bell System held a monopoly over the telecommunications markets for most of the FCC's history and given Congress did not express an interest in lowering the barriers to entry or opening up telecommunications markets to all manner of companies until it passed the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996).

"mere months before the [Clean Water Act] became law," which means its definition could not be deemed authoritative).

Caselaw treats past practice as mere bolstering evidence of an *already reasonable* textual interpretation put forward by the agency. *Compare Young v. Comm. Nutrition Inst.*, 476 U.S. 974, 980–83 (1986) (explaining that the Food and Drug Administration's reading of its enabling statute as affording it the discretion whether to promulgate regulations setting forth the maximum level of adulterating substances created by manufacturing processes permitted in food was reasonably supported by the text of the statute and bolstering this reasonable interpretation with the agency's past practice complying with that interpretation) *with SEC v. Sloan*, 436 U.S. 103, 118 (1978) (rejecting the Securities and Exchange Commission's reliance on its consistent past practice of summarily suspending trading of specific securities by issuing suspension orders every ten days to justify its atextual construction of the Securities Exchange Act because the plain text permitted the agency to issue only one order summarily suspending trading for a *maximum* of ten days). Under this caselaw, the FCC's past revocations do not displace the plain meaning of the text of § 214: the agency lacks such *sua sponte* revocation authority. Because the majority alludes to agency practice to substantiate its reading of § 214—basically, another and similar bootstrap argument—the previous revocation decisions fail to support its atextual interpretation of the Act.

\* \* \*

The FCC's atextual arguments are an attempt by the FCC to increase its power; understandable and perhaps common for an agency, but still improper. The Act's clear text

compels me to conclude that the FCC does not have the power through mere agency action to *sua sponte* initiate in-house revocation proceedings and then revoke duly authorized § 214 certificates, like those that it had issued to CUA. It appears the FCC could seek an injunction against CUA's use of its certificates before an Article III court. *See* 47 U.S.C. § 214(c). But the FCC has not sought such relief yet and instead revoked CUA's certificates through *sua sponte* in-house proceedings without an application before it. The FCC's arrogation of power and *ultra vires* revocation of those duly issued certificates should be set aside, and the certificates reinstated.

## II. CASELAW

While it is not necessary to inquire beyond § 214's text, the majority's atextual analysis should require that it confront binding caselaw that forecloses its interpretation.

Start with the Supreme Court's analysis in *United States v. Seatrain Lines, Inc.*, which dispels any doubt as to the invalidity of this dissent's textual analysis set out above. 329 U.S. 424 (1947). *Seatrain* analyzed whether the Interstate Commerce Commission ("ICC") had the authority to revoke a certificate granted to Seatrain to operate as a *water* carrier.[16] *Id.* at 425–27. In *Seatrain*, a water carrier had been issued a certificate to ferry goods along two pre-specified routes for which it had applied. *Id.* at 426–27. Despite the duly granted certificate, the ICC *sua sponte* reopened the

---

[16] The Supreme Court has deemed the FCC's § 214 telecommunications certificates as materially similar to the certificates issued by the ICC that were at issue in *Seatrain*. *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 474 (1940). This factual similarity thus renders *Seatrain* a valid comparator for our evaluation of the FCC's authority over § 214 certificates.

proceedings and cancelled the certificate it had previously issued. *Id.* at 427. The Supreme Court recognized that the reopening of the proceedings amounted to a revocation of Seatrain's certificate and held that the ICC was without authority to make such a revocation. Citing statutory language authorizing the ICC to revoke only *motor* carrier licenses, the Supreme Court explained that "th[e] difference between the statutory authority of the [ICC] to prescribe the service of water carriers and of motor carriers" meant that the judicial "decisions relating to the [ICC]'s power [] to [revoke the licenses of] motor carriers" were inapposite. *Id.* at 431–32. As a result, it held that absent an express statutory grant of the authority to revoke water-carrier licenses, the ICC "was without authority to revoke Seatrain's certificate." *Id.* at 432–33.

The parallels between *Seatrain* and CUA's petition for review are clear. The FCC is authorized to issue similar certificates to enable telecommunications carriers to operate telecommunications lines (akin to the certificate authorizing Seatrain to carry goods along specified water routes). The FCC may also issue radio station licenses and is specifically authorized to revoke such licenses in specified scenarios (akin to the ICC's motor carrier authority outlined in *Seatrain*'s analysis of the ICC's organic statute). Under *Seatrain*, the lack of a similar grant of revocation authority to the FCC with respect to telecommunications lines under § 214 when Congress authorized such revocation authority over broadcast licenses compels the conclusion that the FCC was without authority to strip CUA of its § 214 certificates.

The majority disputes the application of *Seatrain* to the facts before us and instead embraces the FCC's theory that *Seatrain* is limited to a purported alternate holding. Per the majority, the Supreme Court purportedly held that the

revocation of Seatrain's certificate was problematic because the revocation amounted to the ICC's attempt to limit what services Seatrain provided even though the ICC lacked the authority to "specify 'the service to be rendered'" (i.e., the ferrying of commodities versus the ferrying of equipment) when delimiting the terms of a water carrier certificate. Maj. Op. 37-40 (quoting *Seatrain*, 329 U.S. at 431). There are two reasons why distinguishing *Seatrain* in this manner lacks merit.

First, the purported alternate holding the majority adopts is foreclosed by the language in *Seatrain* itself. Rather than hold that the ICC could not limit water carrier services, the *Seatrain* Court asserted only that whether such goods-related limitations were permitted "[wa]s by no means *free from doubt*" because the statute's text did not state what conditions the ICC could impose. 329 U.S. at 431. This is hardly a Court holding that the ICC's yet untaken actions were impermissible only because the ICC's constituent statute did not permit it to limit the kind of water carrier services provided. But more importantly, the Court expressly held that "certificate[s issued by an agency], when finally granted . . . [are] not subject to revocation in whole or in part except as *specifically* authorized by Congress." *Id.* at 432–33 (emphasis added). Rather than rely on what the Supreme Court might have implicitly held, I would simply apply the unambiguous holding as stated by the Court.

Second, the Supreme Court's subsequent application of *Seatrain* to the dispute in *CAB v. Delta* forecloses the majority's mistaken understanding of *Seatrain*. 367 U.S. at 328–29, 333–34. As the Supreme Court explained in *CAB v. Delta*, the *Seatrain* Court held that "supervising agencies desiring to change existing certificates must follow the procedures 'specifically authorized' by Congress and cannot

rely on their own notions of implied powers in the enabling act." *Id.* at 334.[17]   Thus, contrary to the majority's

---

[17]   The majority quotes from a *portion* of a footnote in *CAB v. Delta* to contend that the Supreme Court adopted its narrow—but mistaken— reading of *Seatrain*.  Maj. Op. 39.  However, the *full* footnote makes clear that the Supreme Court *expressly rejected* the majority's interpretation of *Seatrain*'s holding:

> The **potentially** distinguishing feature about *Seatrain* is that the Court's holding may rest on an alternate ground—viz.: that the [ICC] had no power to impose the conditions it did in the first instance.  **However**, *Seatrain* **cannot be distinguished** on the grounds that the Court said 'the certificate, when finally granted, and the time fixed for rehearing has passed, is not subject to revocation in whole or in part except as specifically authorized . . . .' The point is that, under the Water Carrier Act, the [ICC] had express authority to entertain petitions for reconsideration at any time.  *See* 49 U.S.C. § 916(a). Therefore, it is clear that the [ICC] in *Seatrain* could have reached with impunity the result it wanted to reach by following the procedures set out by Congress.  **The force of the *Seatrain* decision is, then, that the commissions and boards must follow scrupulously the statutory procedures before they can alter existing operations and that arguments to the effect that 'this is just another way of doing it' will not prevail.**

*CAB v. Delta*, 367 U.S. at 333 n.15 (emphasis added).  And setting aside the fact that the out-of-circuit case the majority cites contains ambiguous language that implies that those courts may have misread the Supreme Court's own analysis of *Seatrain*, Maj. Op. 39, neither apply to the case at hand.  Unlike the dearth of *sua sponte* revocation authority granted to the FCC under § 214, the case involved statutes that expressly authorized the actions the agency had taken.  *Murphy Oil Corp. v. FERC*, 589 F.2d 944, 947 (8th Cir. 1978) (holding that there was no "doubt . . .the [Federal Energy Regulatory] Commission['s] rate-making powers" under the Natural Gas Act authorized it to determine the proper price for natural gas sold by petitioner).

characterization, the Supreme Court itself in *CAB v. Delta* understood *Seatrain* to apply to a challenge like CUA's before us.  The Court's own analysis of *Seatrain* in *CAB v. Delta* forecloses the FCC's reliance on its own assertion of some inherent administrative authority to revoke a certificate when the plain terms of its enabling statute do not grant it such power.

Simply, the majority's explanation of *Seatrain* fails to support its atextual analysis.[18]  Under *Seatrain*, the FCC was without authority to revoke CUA's § 214 certificates.  Its *ultra vires* order attempting to do so cannot stand.  CUA's petition for review ought to be granted, and its unlawfully revoked certificates reinstated.

---

[18]  The majority also cites the D.C. Circuit's recent decision in *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022), as further support for its mistaken interpretation of § 214.  Maj. Op. 49-50. While the D.C. Circuit in *China Telecom* summarized the FCC's assertion of its own revocation authority, it was tasked with evaluating only two quite different questions: whether substantial evidence supported the reasoning behind the FCC's decision to revoke China Telecom's certificates and whether due process required more procedures than were afforded to China Telecom before the agency.  57 F.4th at 256, 261, 265, 268.  Whether the FCC had authority to revoke the certificates at all was not a litigated issue.  This limited review of the agency decision in *China Telecom* evinces the D.C. Circuit's adherence to the rule of party presentation (deciding only the issues the parties present) and therefore says nothing about how our sister circuit would rule were it presented with a challenge to the FCC's authority to *sua sponte* revoke § 214 certificates, akin to what CUA raises here.  *See generally United States v. Sineneng-Smith*, 590 U.S. 371 (2020).  Thus, it is not clear that we can deem *China Telecom* as persuasive authority because the D.C. Circuit simply did not analyze the text of § 214 as to the issue whether the FCC has the authority *sua sponte* to revoke § 214 certificates solely through agency action.

## III. "REASONABLENESS" AND POLICY

It is not difficult to see why one might be misled into agreeing with the majority's atextual interpretation of § 214. The FCC's decision to revoke CUA's § 214 certificates appears motivated by quite serious national security concerns. I do not doubt that the policymakers in Washington sincerely believe that CUA's continued operation on American telecommunications networks is a great threat to our nation's national security. I respect that determination. I defer, as I must, to the Executive's assessments of such matters of national security. *See Twitter, Inc. v. Garland*, 61 F.4th 686, 698–99 (9th Cir. 2023). In fact, if asked for my opinion, I would be inclined to agree with the Executive Branch's views regarding the risks posed by the Chinese Communist Party's ability to operate American telecommunications networks. But I am not asked to opine on that issue; I *am* required to apply the text of the Act. As the Supreme Court recently reaffirmed, we do not adopt an interpretation just because the "interpretation . . . does more to advance a statute's putative goal." *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023). "No law 'pursues its purposes at all costs.'" *Id.* (cleaned up) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)). The majority's implicit reliance on the FCC's national security concerns to justify its atextual interpretation of the Act is misplaced: it concludes § 214 contains an implied grant of *sua sponte* revocation authority solely through agency action even though the plain text of § 214 makes clear that Congress omitted to give the FCC that power. Congress can authorize the FCC's *sua sponte* revocation of CUA's certificates if it wishes. The courts of the United States are open to claims to enjoin and prohibit the use of such certificates. Without that case or controversy

before us, we judges, however, cannot authorize the FCC's revocation of CUA's certificates.

The majority also questions this interpretation of § 214 because its practical impact would be shocking. Surprising—let alone seemingly unreasonable—results do not permit us to rewrite the statute for Congress. As the Supreme Court has cautioned, courts "do[] not revise legislation . . . just because the text as written creates an apparent anomaly" that makes "not a whit of sense." *Michigan v. Bay Mills Indian Comm.*, 572 U.S. 782, 794 (2014) (quoting *CSX Transp. Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295–96 (2011)). We are in the business of applying the words of a statute. As the Supreme Court recently reiterated, our judicial oath does not permit us to "replace the actual text with speculation as to Congress' intent," nor to speculate whether Congress made a rational policy choice when it enacted a particular statute.[19] *Perez*, 598 U.S. at 150 (quoting *Henson*, 582 U.S. at 89).

For this reason, the majority's reliance on its own notion of the reasonableness of its interpretation does not resolve

---

[19] It may well be that the Executive Branch has other powers under other national security statutes that enable it to revoke CUA's certificates. CUA's counsel hinted at other mechanisms that the FCC (as well as the federal government writ large) could employ to effectuate its policy goals and to protect against foreign influence over our telecommunications networks. Those mechanisms include FCC cease and desist orders or the President's powers under the International Emergency Economic Powers Act. While the FCC's attorney contended that those mechanisms are not as effective as *sua sponte* revocation, that argument is a policy-based consideration the attorney should direct to Congress, or perhaps the Executive, but not to the courts. Whatever those other powers may be, they are not before us. What is before us is solely the FCC's claim of authority it was not granted by statute. On that basis, the FCC's actions cannot stand.

this case.[20]  Maj. Op. 32.  An inquiry into the reasonableness of one's interpretation of the statute is ineluctably dependent on policy considerations.  One can construct a 'reasonable' policy argument to explain why Congress may choose to give the FCC *sua sponte* revocation authority solely by agency action in light of its statutory mandate.  One can conceive of a 'reasonable' policy argument to justify requiring the FCC to consider national security issues when it revokes a certificate—should Congress eventually authorize the FCC to terminate a telecommunications company's operations *sua sponte* by its own agency action.  One can even foresee that there is a 'reasonable' policy argument for why the FCC needs revocation authority to curtail the Chinese Communist Party's influence over American telecommunications networks.

But the reasonableness of a policy Congress could have implemented is not relevant to our legal analysis.  Whatever reason—if any—Congress had for setting up the certification system upon application by private telecommunications companies is simply not a part of this court's inquiry.  As the Supreme Court has repeatedly "explained, 'even the most formidable policy arguments cannot overcome a clear' textual directive." *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 59 (2023) (quoting *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541–42 (2021)).  This rule has its roots in decisions almost as old as the Supreme Court itself.  As Chief Justice Ellsworth succinctly stated when he rejected a petitioner's argument that policy counseled against finding that a prize's

---

[20]  As explained above, *see supra* Section I.A, it is not reasonable to presume, as the majority does, that in all cases, what one gives, one can take away.

capture was lawful, "[s]uggestions of policy and conveniency cannot be considered in the judicial determination of a question of right." *Moodie v. The Ship Phoebe Anne*, 3 U.S. (3 Dall.) 319, 319 (1796).

The same is true here. When we apply the tools of statutory construction, the text of § 214 is clear: the FCC lacks *sua sponte* revocation authority exercised solely by FCC agency action. This conclusion is supported by the applicable administrative caselaw. CUA was dispossessed of its duly granted § 214 certificates under an order that lacked proper authorization.[21]

---

[21] Because § 214 contains no revocation authority, I do not reach the question of whether the FCC's revocation of CUA's certificates was arbitrary or capricious. The FCC lacked the authority to take the action that it did, which means CUA is entitled to have its § 214 certificates reinstated.

But one observation is in order. Because the FCC lacks such revocation authority, it necessarily follows that Congress did not provide any standards in the text of the Act for assessing whether the FCC's revocation of a § 214 certificate satisfies or fails arbitrary and capricious review. The lack of a textual standard is clear from the fact that at oral argument, the FCC could not provide any concrete metrics or standards for the majority to employ in its arbitrary and capricious analysis. Oral Arg. 24:30–27:04, 28:00–29:20. The FCC argued only that courts should review whether the FCC's actions were in the "public interest." Oral Arg. 24:33–:40, 31:40–32:07. But this is too malleable a standard to check agency overreach: what is in the public's interest is necessarily in the eye of the beholder. Besides, § 214 prescribes different standards for the grant of certificates—"public convenience and necessity." 47 U.S.C. § 214(a). As a result, the majority cannot identify the textual basis for the test it adopts today. I admit that its arbitrary and capricious analysis seems reasonable, if not unassailable. But because the majority authorizes the FCC to exercise revocation authority it was not granted by statute, I simply note that *ex falso sequitur quodlibet*—from falsehood, anything follows.

\* \* \*

For all these reasons, the FCC's actions were unlawful. Until Congress decides to give the FCC *sua sponte* revocation authority solely by its own agency action over § 214 certificates, CUA has a right to provide telecommunications services pursuant to its duly issued § 214 certificates. Therefore, rather than deny CUA's petition for review as the majority does today, I would grant the petition, vacate the FCC's *ultra vires* order, and remand with instructions for the FCC to reinstate CUA's § 214 certificates. Judges must apply the plain terms of the statute as they are written—leaving to the other branches all other policy considerations.

I respectfully dissent.